Junta de Relaciones del Trabajo de Puerto Rico, peticionaria, *v.* Escuela Cooperativa Eugenio María de Hostos, demandada.

*Número:* O-77-443      *Resuelto:* 5 de mayo de 1978

*José Velaz Ortiz,* abogado de la peticionaria; *Demetrio Fernández,* abogado de la demandada.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

La aquí demandada Escuela Cooperativa Eugenio María de Hostos se organizó como entidad cooperativa de padres de estudiantes dedicada a la operación de un centro de enseñanza en San Juan y a tales fines construyó un edificio en Hato Rey y abrió sus puertas en agosto de 1971, comienzo del curso escolar 1971–72. El personal docente había sido seleccionado y empleado por la Sra. Ana María Luquis de Turantán a quien la Junta de Directores de la Escuela había designado Directora de la misma y facultado al efecto. Los profesores fueron contratados por período determinado de tiempo que comprendía de agosto a mayo del año escolar 1971–72.

La Escuela no tardó en confrontar dificultades, algunas inherentes al comienzo de este tipo de empresa, relacionadas con adaptación de la estructura física y escasez de recursos y materiales para el ejercicio docente; y otras relacionadas con el personal, como problemas de disciplina de estudiantes y maestros, deficiencias en la enseñanza, y ausencias y tar-

danzas de profesores. La Directora Sra. Turantán no demostraba capacidad ejecutiva para corregir esta situación, a pesar de que la Junta de Directores de la Escuela la conminó a que ejerciera su autoridad con el personal docente para corregir la anomalía y hasta designó al Dr. José González, Asesor Académico de la Escuela, para que la ayudara en dicha área de responsabilidad de la Directora y en relación con los asuntos que demandaban atención urgente. Como los problemas se agravaron la Junta de Directores llamó una vez más a confrontación a la Sra. Turantán el 22 de octubre de 1971 y en dicha reunión ella presentó la renuncia de su cargo, que le fue aceptada de inmediato. Cuando dentro de las siguientes veinticuatro horas ella retiró la renuncia, los directores rechazaron su retractación y la dejaron fuera.

Mientras tanto los maestros interesados en mejorar sus condiciones de trabajo,(1) derivadas de la falta de recursos disponibles, se reunieron con dos líderes obreros en la biblioteca de la escuela el 20 de octubre de 1971 en busca de orientación sobre la conveniencia de constituir una unión, y el procedimiento a seguir. Acordaron organizarse bajo el nombre "Unión de Educadores de la Escuela Cooperativa Eugenio María de Hostos"; eligieron una directiva, tomaron firmas entre los maestros y el 22 de octubre radicaron la petición de representación ante la Junta de Relaciones del Trabajo de Puerto Rico. Dos días después, el 24 de octubre los maestros se dirigieron por carta a la Junta de Directores de la Escuela repudiando lo que llamaron destitución de la Directora Turantán y solicitando reconsideración de la acción administrativa. La Junta de Directores de la Escuela mantuvo su posición a pesar de subsiguientes representaciones y esfuerzos de los maestros para que se repusiera a la Directora Sra. Turantán y el 27 de octubre el Presidente Dr. Juan B.

---

(1) De estas "condiciones de trabajo", una de las que recibió mayor relieve fue la falta de equipo para que el maestro de educación física pudiera realizar su trabajo hasta que la Directora dio dinero para comprar la bola.

Aponte notificó por carta a los padres de estudiantes la decisión tomada. Los maestros entonces acordaron ir a un paro que llevaron a efecto los días 28 y 29 de octubre y en el que participaron todos menos tres. (²) Al día siguiente el Presidente de la Junta de Directores les escribió calificando el paro como incumplimiento de contrato, y el lunes, 1° de noviembre, 1971 el vicepresidente les remitió cartas informándoles que debido a dicho incumplimiento se había dado por terminado su contrato de empleo y se les había reemplazado permanentemente.

La Unión entonces radicó ante la J.R.T. un cargo de práctica ilícita de trabajo contra la Escuela imputándole discrimen en la tenencia de empleo de Francisca Díaz de Negrón, José A. Rivera, Jorge Luis Cruz, Roamé Torres González "y otros" al despedirles de sus puestos de educadores y el 16 junio, 1972 la Junta expidió querella basada en dicho cargo, en la que se mencionan como querellantes únicamente los cuatro arriba nombrados. La querella imputó a la Escuela la comisión de una práctica ilícita de trabajo dentro del significado del Art. 8(1)(a) y (c) (29 L.P.R.A. sec. 69(1)(a) y (c) (³) consistente en haber despedido empleados por razón

_____

(²) Durante el paro, en su segundo día, un comité conciliador integrado por el Dr. Ismael Rodríguez Bou, el Sr. Frank R. Zorrilla, el Lic. Demetrio Fernández y el Lic. Jaime Fuster se reunió con representantes de los maestros.

(³) "(1) Será práctica ilícita de trabajo el que un patrono, actuando individualmente o concertadamente con otros:

"(a) Intervenga, restrinja, ejerza coerción o intente intervenir, restringir o ejercer coerción con sus empleados en el ejercicio de los derechos garantizados por la sec. 65 de este título.

"(b) .    .    .    .    .    .    .    .

"(c) Estimule, desaliente o intente estimular o desalentar la matrícula de cualquier organización obrera mediante discriminación al emplear, despedir o en relación con la tenencia de empleo u otros términos o condiciones de empleo, incluyendo un paro patronal; Disponiéndose, que nada de lo aquí contenido prohíbe a un patrono hacer un convenio de afiliación total o de mantenimiento de matrícula con cualquier organización obrera no establecida, mantenida o ayudada por acción alguna definida en

de sus actividades concertadas y gremiales. No es hasta el 5 abril, 1974 y durante el curso de la audiencia ante la Oficial Examinador, que se admite una enmienda a las alegaciones adicionando como partes afectadas y querellantes los nombres de veinticuatro personas, bajo la premisa que éstas eran las que tanto en el cargo como en la querella se habían designado como "y otros".

El 11 noviembre, 1975 la Oficial Examinador, Lcda. Nívea R. Avilés Caratini, rindió informe concluyendo que la demandada no incurrió en tales prácticas ilícitas de trabajo y un año más tarde el 12 noviembre, 1976 la Junta peticionaria emitió decisión y orden revocando dicho informe, concluyendo que la demandada discriminó con la tenencia de empleo de los 28 maestros y con los derechos a ellos garantizados por el Art. 4 (4) de la Ley de Relaciones del Trabajo de Puerto Rico. (29 L.P.R.A. sec. 65.) La Junta ordenó a la querellada cesar y desistir en dicha práctica ilícita de trabajo, a mantener fijado por 30 días un aviso ad hoc y a pagar a los maestros los salarios desde la fecha de despido hasta el vencimiento del contrato, con abono de intereses, luego de deducirles los ingresos que durante ese período hubieren recibido, si algunos, por concepto de salarios. Incumplida la Orden, la Junta radicó petición ante este Tribunal Supremo el 30 noviembre, 1977, para que se ponga en vigor. Al efecto libramos el 20 de diciembre último orden para mostrar causa por la que no debamos proveer conforme solicita la Junta y ha comparecido la Escuela demandada en alegato escrito en

---

este subcapítulo como práctica ilícita de trabajo, si dicha organización obrera representa una mayoría de los empleados en una unidad apropiada con facultad para la contratación colectiva."

(4) *Sec. 65. Derecho de empleados a organizarse y negociar*

"Los empleados tienen derecho, entre otros, a organizarse entre sí; a constituir, afiliarse o ayudar a organizaciones obreras; negociar colectivamente a través de representantes por ellos seleccionados; y dedicarse a actividades concertadas con el propósito de negociar colectivamente u otro fin de ayuda o protección mutua."

oposición al cual también admitimos una réplica de la Junta presentada el 17 marzo próximo pasado. Hemos considerado todos los escritos y examinado la transcripción y *exhibits* de prueba y procedemos a resolver.

La Escuela demandada hace en su alegato los siguientes señalamientos de error:

"1. Cometió grave error de derecho la Junta de Relaciones del Trabajo al encontrar que la demandada, Escuela Cooperativa Eugenio María de Hostos, había cometido las prácticas ilícitas de discriminación sindical y la de haber interferido con los derechos de los empleados a efectuar actividades concertadas, conducentes a la representación sindical y la negociación colectiva, toda vez que la prueba no sostiene tal conclusión como cuestión de derecho.

2. La inclusión de 24 personas, no mencionadas por sus nombres ni en el cargo y la querella en base a que la palabra *otros* los cubría, transcurrido tres años después de haber acontecido los hechos que dan lugar a la querella constituye una violación al debido procedimiento de Ley y a las disposiciones legales y reglamentarias que le son de aplicación al organismo administrativo."

■ El Art. 9(2) (a) de la Ley de Relaciones del Trabajo de Puerto Rico (29 L.P.R.A. sec. 70(2) (a)) dispone que: "las conclusiones de la Junta en cuanto a los hechos, si estuvieren respaldadas por la evidencia, serán concluyentes." (5) E impartiendo eficacia al mandato legislativo dijimos en *J.R.T.* v. *Línea Suprema, Inc.*, 89 D.P.R. 840, 849 (1964):

"Aunque estamos conscientes que existe prueba conflictiva de la cual podamos inferir conclusiones distintas a las de la Junta, sin embargo, ésa es misión que no nos pertenece. La determinación en cuanto a testimonio conflictivo concerniente al despido de em-

---

(5) Principio sostenido entre otros, en *Junta Relaciones del Trabajo* v. *Namerow*, 69 D.P.R. 82 (1948); *Rivera* v. *Junta Rel. Trabajo*, 70 D.P.R. 5 (1949); *Rivera* v. *Junta Rel. Trabajo*, 70 D.P.R. 342 (1949); *Junta Rel. Trabajo* v. *Simmons Int'l, Ltd.*, 78 D.P.R. 375 (1955); *A.F.F.* v. *J.R.T.*, 99 D.P.R. 911 (1971); véase, *Universal Camera Corp.* v. *N.L.R.B.*, 340 U.S. 474.

pleados y la deducción de inferencias de hechos establecidos en la vista caen dentro de la competencia de la Junta y no debemos pasar sobre la credibilidad de testigos o repesar la evidencia. Nuestra función es tomar el récord en su totalidad y poner en vigor la orden si encontramos evidencia sustancial para sostener las conclusiones de la Junta."

De inmediato nos expresamos inclinados a ser "más rigurosos que de costumbre" cuando la decisión de la Junta no está precedida por un informe del Oficial Examinador que presidió la vista del caso. Notamos que en el caso de autos sí hubo un informe de la Oficial Examinadora contrario e incompatible en sus conclusiones con las determinaciones de la Junta. El conflicto de dos apreciaciones dispares dentro del mismo organismo administrativo se complica por el hecho de que la evidencia documental, de carácter primario([6]) y de contemporaneidad irrecusable con los actos y conducta de las partes allá para fines de octubre y principios de noviembre de 1971 que dieron lugar a este procedimiento, enerva la evidencia oral producida en la audiencia dos años y medio (2-1/2) después. En la estimación de evidencia documental este Tribunal, bien coincida con la Oficial Examinador o con la Junta, no está restringido por deferencia a la mejor percepción y a la impresión derivada del contacto inmediato y directo con los testigos que son atributos de quien preside la vista. *Planned Credit of P.R., Inc.* v. *Page,* 103 D.P.R. 245, 261-2 (1975).

■ La cuestión planteada es si la huelga de dos días, causa de la cancelación de los contratos de los profesores por la Escuela, y cuyo objetivo único fue protestar la separación de la Directora y presionar la Junta de Directores para su reposición, es o no una actividad concertada de las protegidas por Ley.

---

([6]) Art. 7, Ley de Evidencia—"Evidencia primaria es aquella que en cualquiera circunstancia posible produce la mayor certeza del hecho controvertido. Así un documento escrito es en sí la mejor evidencia posible de su existencia y contenido." 32 L.P.R.A. sec. 1627.

Que el paro de los días 28 y 29 de octubre en nada se relacionaba con las condiciones de trabajo de los maestros, y que tuvo como único propósito protestar la remoción de la Directora y la presencia de su substituto, es inferencia de claridad meridiana que se afinca en varias piezas de evidencia documental.

El 24 octubre, 1971 los maestros dirigen al Dr. Juan B. Aponte, Presidente de la Junta de Directores de la Escuela, la siguiente carta:

"Nosotros los abajo firmantes, miembros de la facultad de la Escuela Cooperativa Hostos, repudiamos enérgicamente la decisión y los procedimientos seguidos por la Junta de Directores al despedir sumariamente a la Sra. Ana María Luquis de Turantán, Directora de la Escuela.

Esta decisión causa en nuestra escuela una situación de crisis, pues consideramos que la Sra. Luquis es la persona más indicada para ejercer las funciones de directora. Por tales razones exhortamos a la Junta a que reconsidere su decisión.

En la eventualidad de que persista una actitud negativa por parte de ustedes nos reservamos igualmente utilizar los derechos que se garantizan a todo socio en una entidad como la nuestra, y a todo ciudadano en un sistema democrático." (*Exhibit* 5 de ambas partes.)

Al presentar como destitución sumaria lo que fue renuncia voluntaria de la Directora, los maestros no solo cuestionaban la autoridad de la Junta de Directores del patrono para el ejercicio de la prerrogativa gerencial de escoger su supervisora, sino que invadían el campo de su discreción para aceptarle la renuncia.

El 26 octubre, 1971 los profesores le escriben al nuevo Director de la Escuela, Prof. Ezequiel Gómez, que sustituye a la Sra. Turantán, en los siguientes términos:

"Le notificamos que la decisión relativa a la destitución de la Sra. Ana María Luquis de Turantán está sujeta a una solicitud de reconsideración, que con carácter oficial ya ha sido radicada ante la Honorable Junta de Directores de esta cooperativa.

Consecuentemente, en adición a un factor de confianza existe en este momento un fundamento legal que nos permite seguir considerando a la Sra. Luquis como nuestra directora.

A efectos del mejor funcionamiento de la escuela hemos seleccionado dos portavoces, Sr. Roamé Torres y Srta. Ethel M. Ríos, a quienes debe dirigirse si fuese necesario comunicarse con la facultad."

El texto demuestra que 48 horas antes del paro los maestros contratados para servir a la Escuela se rebelaban contra decisiones administrativas de la Junta de Directores, le negaban su confianza al nuevo Director de la Escuela y seguían "considerando a la Sra. Luquis [de Turantán] como nuestra directora." Con tan clara consigna de imponer su criterio en la selección del Director de la Escuela, sin la más remota alusión a *condiciones de trabajo* paralizan la actividad docente yéndose a la huelga, y cuando quieren justificar su acción ante los padres, miembros de la cooperativa, el mismo primer día de huelga les escriben:

"Estimados Padres:

Los maestros de esta escuela hemos decidido recesar las labores docentes los días jueves 28 y viernes 29 del corriente mes por considerar que la situación por la que atraviesa la escuela es intolerable.

Nuestra determinación viene a raíz de la posición intransigente de la Junta de Directores. Esta ha rehusado revisar su decisión de rescindir el contrato de la señora directora y de tomar en cuenta todas las partes envueltas."

No estuvo nunca en controversia el hecho de que la Sra. Turantán, como Directora del plantel, tenía las atribuciones y facultades que tipifican al supervisor definido bajo el término "patrono" en el Art. 2(2) ([7]) de la Ley de Relaciones

---

([7]) Art. 2(2), Ley de Relaciones del Trabajo

"(2) El término 'patrono' incluirá ejecutivos, supervisores y a cualquier persona que realizare gestiones de carácter ejecutivo en interés de un patrono directa o indirectamente, pero no incluirá excepto en el caso de las instrumentalidades corporativas del Gobierno de Puerto Rico como más adelante se definen, al Gobierno ni a ninguna subdivisión política del

del Trabajo (29 L.P.R.A. sec. 63(2)), tales como contratar, disciplinar y despedir empleados, e implementaba el curso normativo de la institución aprobado por su Junta de Directores.

■ La huelga carecía de toda legitimidad gremial, no cumplía propósito alguno ni avanzaba derecho protegido por el Art. 4 de la Ley. (29 L.P.R.A. sec. 65.) El movimiento de paro y abandono de sus obligaciones contractuales surge aislado y desvinculado de las actividades ya encaminadas por los maestros para constituirse en unión independiente. No hay nexo entre la gestión sindical para mejorar sus condiciones de trabajo y el paro dirigido a forzar la facultad nominadora del patrono. La huelga fue, por tanto, ilícita y vulnerante de obligaciones contractuales, conducta que justificó la carta del vicepresidente de la demandada Simmons, de fecha 1° noviembre, 1971 a cada huelguista dando por terminada la relación obrero-patronal en los siguientes términos:

"Tengo a bien informarle que hemos dado por terminado su contrato de empleo debido a la conducta observada por usted durante los días 28 y 29 de octubre, que implica incumplimiento del mismo. En consecuencia, hemos procedido a reemplazarle a usted permanentemente . . . ."

■ La protesta de los empleados, consistente en un paro de labores por sanción disciplinaria impuesta a un supervisor, no es actividad concertada protegida por ley (*N.L.R.B.* v. *Reynolds International*, 162 F.2d 680 (1947)); como tampoco lo es la protesta contra un supervisor. *Joanna Cotton Mills Co.* v. *N.L.R.B.*, 176 F.2d 749 (1949). Se reconoce una excepción y la huelga se considerará actividad protegida cuando la separación de un supervisor tiene impacto sobre los propios intereses de trabajo de los empleados. *Mead Corp.*, 86

mismo; Disponiéndose, que incluirá, además, a todo individuo, sociedad u organización que intervenga a favor de la parte patronal en cualquier disputa obrera o negociación colectiva."

L.R.R.M. 1501 (1974). En dicho caso, Handel, Sr., era un supervisor de bajo rango que se confundía en el trabajo con los demás empleados y quien tenía frecuentes discusiones con el patrono relacionadas con las condiciones de trabajo en el almacén, al punto que en una reunión acusó al presidente de explotar (*screw*) los hombres que allí trabajaban. "De modo," dijo la Junta Nacional, "que Handel, Sr. estaba claramente identificado por los empleados de almacén como defensor de sus intereses contra la alta dirección." No era éste el caso de la Sra. Turantán. Aun así en la audiencia la maestra Ríos Orlandi generalizó diciendo que (la Directora) "es parte de las condiciones de trabajo" (T.E. pág. 170) olvidando que para los días de la huelga 2-1/2 años atrás nada sobre ese extremo afloró en la protesta.

Contra esta prueba documental irrefutable, no basta ni aun cuando fuere creída por la Junta, para relacionar la cancelación de los contratos de los profesores con sus actividades sindicales, la exclamación del Dr. Simmons en conversación con la Directora en torno a los problemas de la Escuela: "Eso es lo que nos falta, una unión"; ni la información por el Dr. Aponte a los padres de estudiantes al efecto de que la Directora había dado el "visto bueno" para que los maestros se organizaran en sindicato.

■ La prueba estableció que la huelga de los profesores no fue actividad gremial protegida, sino incumplimiento de obligaciones contractuales, por lo que al rescindir los contratos la Escuela demandada no incurrió en la práctica ilícita de trabajo a ella imputada en la querella. *J.R.T.* v. *Bankers Club of P.R., Inc.*, 94 D.P.R. 600 (1967).

La conclusión a que hemos llegado hace innecesario atender al segundo señalamiento de error fundado en la admisión de una enmienda a la querella dos años después de expedida la misma para añadir 24 querellantes, y la defensa de incuria opuesta por la demandada. *Cf. J.R.T.* v. *P.R. Telephone Co., Inc.*, 107 D.P.R. 76 (1978).

*Con estos antecedentes y fundamentos la Orden dictada el 12 de noviembre de 1976 por la Junta de Relaciones del Trabajo de Puerto Rico será, revocada.*

El Juez Presidente Señor Trías Monge emitió opinión concurrente a la cual se une el Juez Asociado Señor Irizarry Yunqué. El Juez Asociado Señor Rigau no intervino.

—O—

Opinión concurrente del Juez Presidente, Señor Trías Monge, a la cual se une el Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 5 de mayo de 1978

La tarea principal que nos impone este recurso es definir nuestra función revisadora de las decisiones de la Junta de Relaciones del Trabajo de Puerto Rico, determinar su ámbito y precisar el modo de su ejercicio.

El Art. 9(2)(a) de nuestra Ley de Relaciones del Trabajo, Ley Núm. 130 de 8 de mayo de 1945, 29 L.P.R.A. sec. 70(2)(a), ordena:

". . . Las conclusiones de la Junta en cuanto a los hechos, si estuvieren respaldadas por la evidencia, serán concluyentes . . . ."

Esta disposición deriva del Art. 10(e) de la Ley Wagner de 5 de julio de 1935, 49 Stat. 449, 454, ch. 372, 29 U.S.C.A. sec. 160(e), la que disponía:

". . . The findings of the Board as to the facts, if supported by evidence, shall be conclusive . . . ."

El criterio de revisión enunciado por ambos estatutos fue modificado por ley en Estados Unidos, pero no en Puerto Rico. La Ley Taft-Hartley de 23 de junio de 1947, 61 Stat. 148, ch. 120, 29 U.S.C.A. sec. 160(e), dispuso:

". . . The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive . . . ."

Véase también el Art. 10(e) de la Ley Federal de Procedimiento Administrativo de 11 de junio de 1946, 60 Stat. 243, 244, ch. 324, 5 U.S.C.A. sec. 706, según enmendado el 6 de septiembre de 1966, 80 Stat. 393. El cambio efectuado por ambas leyes obedeció a razones que conviene recordar.

En *Washington, V. & M. Coach Co.* v. *N.L.R.B.*, 301 U.S. 142 (1937), el Tribunal Supremo resolvió que el término *"evidence"*, según empleado en la parte citada de la Ley Wagner, significaba "prueba sustancial." Aun así, el modo en que se aplicó posteriormente por los tribunales la norma de revisión establecida por la Ley Wagner no fue del agrado del Congreso. Estimó este Congreso que se le estaba confiando por las cortes demasiada latitud a la Junta de Relaciones del Trabajo. El resultado fue la estructuración de una nueva regla a través de la Ley Taft-Hartley para expandir el radio de la revisión judicial. *Universal Camera Corp.* v. *National Labor Relations Board,* 340 U.S. 474, 477–490 (1951); Morris, *The Developing Labor Law,* Washington, 1971, págs. 880–881; Gellhorn y Robinson, *Perspectives on Administrative Law,* 75 Colum. L. Rev. 771, 789 (1975); S. Rep. No. 105 on S. 1126, 80th Cong., 1st Sess., reimpreso en 1 *Legislative History of the Labor Management Relations Act,* 1947, vol. 1, Government Printing Office, 1948, págs. 432–433. Fueron circunstancias especiales, por tanto, las que dictaron la formulación del criterio que hoy priva en Estados Unidos respecto a la revisión de las órdenes de la Junta de Relaciones del Trabajo.

En Puerto Rico no se dieron las condiciones que produjeron la Ley Taft-Hartley. No existe un mandato legislativo para expandir en modo comparable el radio de la revisión judicial. No hay evidencia de que se crease aquí el clima de inconformidad legislativa que requirió la reforma de la antigua norma. Examinemos a la luz de estos hechos la jurisprudencia interpretativa del Art. 9(2)(a) de nuestra ley, cuya

parte aquí citada no ha sufrido enmiendas desde su aprobación en 1945.

En *Junta de Relaciones del Trabajo* v. *Namerow*, 69 D.P.R. 82, 87 (1948), después de la aprobación de la Ley Taft-Hartley, se afirmó:

"No se nos han conferido poderes ilimitados para revisar las conclusiones de hecho de la Junta. El artículo 9(2)(a) de la Ley dispone que 'Las conclusiones de la Junta en cuanto a los hechos, si estuvieren respaldadas por la evidencia, serán concluyentes.' Sólo en caso de que el récord no contenga evidencia en apoyo de las conclusiones de hecho a que llegue la Junta estaríamos autorizados para resolver, como cuestión de derecho, que las conclusiones de hecho, y la orden en éstas basada, no pueden subsistir."

Al mismo efecto: *Rivera* v. *Junta Rel. Trabajo*, 70 D.P.R. 342 (1949). Adviértase la notable diferencia entre *Namerow* y *Universal Camera*, que se resolvería en 1951.

Después de *Universal Camera* se continuó respaldando el criterio de *Namerow*. *Junta Rel. Trabajo* v. *Unión de Chóferes*, 73 D.P.R. 989, 995 (1952). Véase *Ledesma, Admor.* v. *Trib. de Distrito*, 73 D.P.R. 396, 401 (1952), donde se dijo:

"Es regla establecida en el aún creciente campo del derecho administrativo americano que 'la función judicial se cumple cuando se encuentra una base racional para las conclusiones de la agencia administrativa' [cita de Cardozo] sin que deba llegarse en dicha función a sustituir el criterio del tribunal por el de la agencia administrativa cuya actuación—generalmente en materia especializada—se intenta revisar."

Al mismo efecto: *Junta Rel. Trabajo* v. *Simmons Int'l, Ltd.*, 78 D.P.R. 375, 386 (1955), en que se determina que la evaluación de la credibilidad de los testigos es función exclusiva de la Junta; *Junta Rel. Trabajo* v. *Acevedo*, 78 D.P.R. 540, 545 (1955); *J.R.T.* v. *Bankers Club of P.R., Inc.*, 94 D.P.R. 600, 603 (1967).

En *J.R.T.* v. *Línea Suprema, Inc.*, 89 D.P.R. 840, 849–850 (1964), ocurrió algo que conviene explicar. De un lado se respaldó a *Namerow* y del otro se hizo referencia a citas

fundadas en el criterio de la Ley Taft-Hartley, nunca adoptado por nuestra Asamblea Legislativa. Expresó el Tribunal en *Línea Suprema:*

"Aunque estamos conscientes que existe prueba conflictiva de la cual podamos inferir conclusiones distintas a las de la Junta, sin embargo, ésa es misión que no nos pertenece. La determinación en cuanto a testimonio conflictivo concerniente al despido de empleados y la deducción de inferencias de hechos establecidos en la vista 'caen dentro de la competencia de la Junta y no debemos pasar sobre la credibilidad de testigos o repesar la evidencia. Nuestra función es tomar el récord en su totalidad y poner en vigor la orden si encontramos evidencia sustancial para sostener las conclusiones de la Junta. *N.L.R.B.* v. *Ferguson,* 5 Cir., 1958, 257 F.2d 88 . . . .' "

*Línea Suprema* no conflige con *Namerow*. En el contexto histórico en que se produce, no debe entenderse que *Línea Suprema* incorporó el clima a que respondió el lenguaje de la Ley Taft-Hartley sobre la revisión de las decisiones administrativas. *Línea Suprema* no expande el poder de revisión judicial de las decisiones de la Junta de Relaciones del Trabajo de Puerto Rico.

Abundan en el derecho conceptos espaciosos y elásticos, cuyo contenido se fija y altera conforme a múltiples factores. Los criterios de "base racional", "evidencia sustancial" y "evidencia sustancial a la luz de la totalidad del récord" son ejemplos de ello. Si atendemos principalmente el aspecto semántico de estas normas la tarea es por lo general frustrante. Hay que examinar las circunstancias en que operan, la razón de su empleo en el caso específico que nos ocupa. El uso de principios generales de derecho administrativo fuera de contexto es labor en extremo peligrosa. Gellhorn y Robinson, *Perspectives on Administrative Law*, 75 Colum. L. Rev. 771, 783 (1975). No existe en el derecho administrativo o constitucional de nuestro país principio alguno que exija que las decisiones de todas las agencias del Estado deban indefecti-

blemente revisarse a la luz del criterio de evidencia sustancial con miras a la totalidad del récord.

Tras la corteza verbal de esta y otras fórmulas se hallan otras capas de realidad cuyo análisis es usualmente más productivo. Hay diferentes tipos de mandato que una Asamblea Legislativa puede emitir para delimitar la esfera de acción de los tribunales frente a los hechos determinados por las agencias administrativas. Pueden dictarse mandatos distintos para organismos diferentes. Todos ellos son, a causa de su propia esencia, necesariamente flexibles. La Asamblea Legislativa puede desear que la revisión judicial se circunscriba al papel más modesto que la Constitución pueda permitir. En tales ocasiones por lo general se expresa que no se intervendrá con la determinación administrativa de los hechos, excepto cuando la misma sea arbitraria o manifiestamente errónea o producto de la parcialidad o el prejuicio o tan carente de apoyo en la prueba que no pueda hallarse ni aun una partícula de la misma que la justifique. De desearse un escrutinio más estricto se emplean fórmulas tales como las de la base racional, la prueba sustancial o la prueba sustancial en vista a la totalidad del récord. Cuando el propósito es conceder poder independiente a los tribunales para enjuiciar los hechos se les permite aquilatar sin trabas parte de la prueba, tal como la prueba pericial—véase el Art. 11 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 12—apreciar por sí mismos el peso preponderante de la prueba o, aún más allá, descartar el récord y celebrar un juicio *de novo*. No es posible hacernos en este campo de una escala Richter que clasifique cada fenómeno automáticamente. La dificultad reside esencialmente en la precisa aplicación del principio. Identificada la norma de revisión dictada por el estatuto, el peligro estriba en que el examen de los hechos nos lleve insensiblemente a la utilización de otra. Jaffe, *Judicial Control of Administrative Action*, abridged ed., 1965, pág. 602. Se navega aquí por aguas trai-

cioneras, plenas de corrientes fuertes, a veces opuestas y súbitamente cambiantes. En su fondo se agitan oscuros objetos —la función de la agencia, su prestigio, la calidad de sus decisiones, su objetividad o arbitrariedad—que pueden perturbar el viaje. Los criterios de revisión, como los colores en su escala, tienden a fundirse y a emerger gradualmente los unos de los otros.

Las instancias más frecuentes de rendirle pleitesía a un criterio y emplear otro se dan precisamente en los intentos de revisar la determinación administrativa de los hechos a la luz de la totalidad de la prueba. Varios tribunales se han inclinado en ocasiones a examinar el récord para fines de llegar a sus propias conclusiones sobre la preponderancia de la prueba, en vez de limitarse a resolver si las determinaciones del organismo estaban respaldadas por prueba sustancial. Notes, *Judicial Review of an Agency's Determination of Fact in North Dakota,* 40 N.D.L. Rev. 292, 298 (1964); Jaffe, *loc. cit.* Otros tienden a equiparar equivocadamente la deferencia que muestran los foros apelativos ante las determinaciones de hecho de los tribunales con la que se debe a las conclusiones de igual índole de los órganos administrativos.

De lo anterior, así como de otros aspectos de la jurisprudencia y la doctrina, se desprenden varias conclusiones:

1. Las determinaciones de la Junta de Relaciones del Trabajo de Puerto Rico en cuanto a los hechos no pueden ser alteradas por los tribunales de existir evidencia que las respalde.

2. Evidencia significa dentro del contexto de nuestro estatuto y la tradición de su modelo, la Ley Wagner, evidencia sustancial. No basta con un mero destello de prueba.

3. La deferencia que muestran los foros apelativos ante las determinaciones de hecho de los tribunales obedece a razones distintas a las que exigen deferencia a determinaciones administrativas análogas. En el primer caso, la regla de deferencia se funda mayormente en el hecho de que la corte

recurrida ha tenido oportunidad de observar a los testigos y juzgar su credibilidad. *Castro* v. *Meléndez*, 82 D.P.R. 573, 576 (1961); Regla 43.1 de Procedimiento Civil. De ahí que dicha deferencia no exista con relación a conclusiones de hecho basadas en prueba documental. *Planned Credit of P.R., Inc.* v. *Page*, 103 D.P.R. 245, 261–262 (1975). Esta no es la razón básica para la regla de deferencia en el campo administrativo. Si lo fuera, el objeto de la deferencia tendría que ser las conclusiones del Oficial Examinador y no las del organismo administrativo en sí. La razón fundamental es la especialización y experiencia de la agencia administrativa en el campo que le ha sido encomendado. Véanse: *Vda. de Alfonzi* v. *Comisión Industrial*, 90 D.P.R. 693, 705 (1964); *Colonos de Santa Juana* v. *Junta Azucarera*, 77 D.P.R. 392, 396 (1954); *South P.R. Sugar Co.* v. *Junta*, 82 D.P.R. 847, 864–865 (1961). La deferencia a que obligan estas consideraciones alcanza incluso a cuestiones ajenas propiamente a la pura adjudicación de los hechos. *Rodríguez* v. *Comisión Industrial*, 99 D.P.R. 368, 375 (1970).

4. De hallarse apoyo sustancial en la prueba para llegar racionalmente a conclusiones dispares tampoco puede rechazarse la versión preferida por la Junta, aun cuando el Tribunal entienda que la preponderancia de la prueba favorece otro resultado. La función del Tribunal no es intervenir con las determinaciones de la Junta sobre la credibilidad de los testigos o el valor de la prueba documental. Su papel no es repesar la evidencia sino juzgar su sustancialidad.

5. Para precisar si existe evidencia sustancial es necesario examinar la totalidad del récord y no porciones aisladas del mismo. El examen de la totalidad del récord no tiene aquí, contrario a lo que sucede bajo la Ley Taft-Hartley, el propósito de coartar la discreción de la Junta de Relaciones del Trabajo. Como sucede en este propio caso, el récord puede revelar circunstancias que disminuyan la sustancialidad de la prueba. Adviértase en este sentido que existe una fina, pero

capital diferencia, entre escudriñar el récord para hallar la interpretación que mejor concuerde con los hechos, o para el Tribunal evaluar independientemente parte de la prueba oral o documental, y examinarlo para precisar simplemente si contiene prueba sustancial en apoyo de las conclusiones de la Junta. Nótese que emplear el método de la lectura total del récord no quiere decir que este Tribunal haya adoptado un criterio más riguroso que el prevaleciente bajo la antigua Ley Wagner para revisar las decisiones de la Junta de Relaciones del Trabajo. La glosa es separable del texto, la letra de la música.

Es por razón de la dificultad que hallo con las conclusiones a que llega la Junta en este litigio que he estimado prudente repasar las pautas que frenan nuestra discreción en el ejercicio de la función revisora. Es en situaciones de este género donde puede ocurrir más fácilmente una involuntaria distorsión del papel que nos corresponde desempeñar.

En su decisión y orden de 12 de noviembre de 1976 la Junta concluyó que el despido de los profesores querellantes ante ella constituía una práctica ilícita del trabajo bajo las disposiciones del Art. 8(1)(c) de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945, 29 L.P.R.A. sec. 69(1)(c), que así clasifica la acción de un patrono que "Estimule, desaliente o intente estimular o desalentar la matrícula de cualquier organización obrera mediante discriminación al emplear, despedir o en relación con la tenencia de empleo u otros términos o condiciones de empleo, incluyendo un paro patronal . . . ."

Según expusimos en *J.R.T.* v. *Bankers Club of P.R., Inc.*, 94 D.P.R. 600, 604 (1967), el peso de probar una violación al Art. 8(1)(c) "recae sobre los abogados de la Junta. Estos han de probar afirmativamente, mediante evidencia sustancial y no por medio de inferencias derivadas de otras inferencias, que los despidos en determinado caso fueron causados por actividades gremiales." No basta con probar, recal-

camos allí, que el empleado despedido estaba participando en alguna actividad protegida por la ley. Hay que demostrar también "que tales empleados fueron despedidos debido a su participación en actividades gremiales." *Loc. cit.*

Existe base en el récord para concluir que la Junta de Directores de la Escuela estaba enterada de los intentos de sindicalización de los profesores. (T.O. 239–240, 312–313, 338–340, 385, 387, 403), pero no hemos hallado prueba sustancial indicativa de que estos intentos motivaron los despidos. Menciona la Junta tan solo en su decisión que el vicepresidente de la Junta de Directores de la Escuela estuvo presente en la reunión en que los líderes obreros discutieron el procedimiento para unionarse y que fue él quien más tarde firmó las cartas de despido. (Véase el *exhibit* 2 sometido por estipulación.) Esta circunstancia aislada carece de la sustancialidad requerida cuando se le examina dentro del contexto de los hechos ocurridos, en que los profesores afectados repudiaron el despido de la Directora, se negaron a reconocer a la persona que la sustituyó y poco después fueron al paro. No se trata de dos inferencias permisibles, en cuyo caso se debe acatar la escogida por la Junta. Se trata de la carencia adecuada de prueba para justificar la posición de la Junta. La simple firma de las cartas de despido por el referido funcionario no constituye base de suficiente firmeza para sostener la determinación administrativa.

Así lo consideró la Oficial Examinadora de la Junta al concluir que los empleados no fueron despedidos por su participación en actividades gremiales protegidas por la ley. Las recomendaciones de un Oficial Examinador no son concluyentes para la Junta, ya que es ella la que está investida de la responsabilidad primaria de determinar los hechos, *Rivera v. Junta Rel. Trabajo*, 70 D.P.R. 342, 345–346 (1949), pero merecen consideración en el proceso de determinar la sustan-

cialidad de la evidencia. 2 Davis, *Administrative Law Treatise*, sec. 10.04, pág. 19. Véanse: *Universal Camera Corp.* v. *National Labor Relations Board*, 340 U.S. 474, 496–497 (1951); *Federal Communications Commission* v. *Allentown Broadcasting Corp.*, 349 U.S. 358, 364 (1955). En el recurso de autos una prueba de por sí endeble es debilitada aún más por las conclusiones contrarias de la Oficial Examinadora.

Respecto a la alegada violación al Art. 8(1)(a) de la Ley, 29 L.P.R.A. sec. 69(1)(a), las determinaciones de la Junta son altamente especulativas. La Junta expresa en su decisión que

"El despido de la Sra. Luquis de Turantán significaba para los maestros el romper los vínculos y canales de comunicación que tenían con la Junta de Directores. En adición, podían temer el que hubieran represalias contra ellos debido a su interés en la sindicalización, ya que se había acusado a la Directora de haber dado el visto bueno a la unión. Se acusaba a la Directora de carecer de liderato. Esto tiene una relación íntima con las condiciones de trabajo de estos profesores, ya que la Junta de Directores pensaba que la Directora no estaba supervisando adecuadamente la labor de los maestros día a día."

No hemos hallado evidencia sustancial que apoye estas conclusiones e inferencias. La Oficial Examinadora tampoco pudo hallar prueba adecuada para sostener este cargo. Es tenue la relación entre los alegados hechos expuestos por la Junta y los términos y condiciones de empleo de los profesores despedidos. Es amplia la discreción de la Junta y considerable la deferencia debida a sus determinaciones de hecho, pero no se satisface en este caso el criterio de la prueba sustancial, aun en la versión menos rigurosa prevaleciente en Puerto Rico.

Por las razones expuestas estimo que debe revocarse la orden recurrida.