*965 TEXTO COMPLETO DE LA SENTENCIA
I
El Sr. Wilfredo Ríos Santiago (Recurrente), se desempeñaba como miembro de la Policía de Puerto Rico, adscrito a la División de Vehículos Hurtados, del área de Caguas. El 17 de junio de 2004 le fue remitida por el Superintendente de la Policía (Superintendente) una carta de formulación de cargos. [1] Estos estaban relacionados a una intervención del Recurrente con los ocupantes de un vehículo, que culminó con la muerte de uno de ellos el 23 de diciembre de 2002, en el área de Aguas Buenas. Se imputó violación al Artículo 14; See. 14.5, Números 1, 2, 4 y 27 del Reglamento de Personal de la Policía de Puerto Rico, que son faltas graves y que disponen lo siguiente:
“Número 1: “Demostrar incapacidad manifiesta, ineptitud, descuido, parcialidad o negligencia en el desempeño de sus deberes, funciones y responsabilidades.”
Número 2: “Amenazar con o hacer uso de un arma de fuego contra cualquier persona, excepto en casos de legítima defensa propia o la de un semejante.”
Número 4: “Disparar un arma de fuego al aire, contra animales, objetos o estructuras viciosamente o sin justificación alguna.”
Número 27: “Observar una conducta lesiva, inmoral o desordenada en detrimento del Cuerpo de la Policía.”
En la comunicación se le advirtió de su derecho a solicitar una vista informal ante un Oficial Examinador y otros derechos procesales apelativos a los que tenía derecho. También se le informó que la sanción que se contemplaba imponerle era la expulsión de su puesto en la Policía de Puerto Rico. [2]
El 17 de agosto de 2005 le fue cursada al Recurrente, por el Superintendente, otra carta donde se le informaba que luego de completada la investigación administrativa se confirmaba la sanción anunciada en la Resolución de Cargos y se le expulsaba de su puesto en la Policía de Puerto Rico.
Oportunamente, el Recurrente presentó un escrito de Apelación ante la Comisión de Investigación de Procesamiento y Apelación (CIPA) donde solicitaba la revocación de la decisión del Superintendente y la reinstalación en su cargo.
El 18 de junio de 2008 y luego de celebrarse la vista en su fondo, la CIPA emitió Resolución confirmando la expulsión del Recurrente. En esencia, la CIPA concluyó que a la luz de la totalidad de la evidencia presentada y admitida, el Recurrente ■úncurrió • en las faltas imputadas, demostrando incapacidad e ineptitud para desempeñar las funciones de su puesto.
Ante su inconformidad con la decisión de la CIPA, el Recurrente presentó ante este foro apelativo un recurso de revisión judicial. En éste, señaló como error que la CIPA fundamentara sus determinaciones de hechos y conclusiones de derecho con prueba que nunca desfiló, menoscabando nuestro ordenamiento jurídico, lo que representaba un abuso de discreción de la Comisión.
La Policía de Puerto Rico, representada por la Procuradora General, ha comparecido mediante alegato en oposición. Argumentó, que de la prueba presentada se sostienen las determinaciones de la CIPA, las cuales son legales y razonables.
*966 Con el beneficio de los alegatos de ambas partes, la transcripción de la prueba oral desfilada ante la CIPA y copia del expediente administrativo, procedemos a resolver.
II
Durante la vista administrativa declararon diversos testigos. El primero, Luis A. Nieves Meléndez, era quien acompañaba al occiso Alexander Vargas Báez en el vehículo que fue intervenido por el Recurrente y su compañero. Declaró sobre cómo ocurrieron los hechos. Luego declaró el Teniente Enrique Rivera Vega, de la División de Homicidios quien tuvo a su cargo la investigación policíaca de los hechos que culminaron con la muerte del joven Alexander Vargas Báez. Su testimonio abordó sobre los detalles de la investigación de la escena. La tercera persona en declarar fue Aída I. Hernández Alemán, que era la encargada de la Propiedad y Armas de Fuego, quien identificó el arma asignada al Recurrente. El cuarto testigo fue Carlos Rivera Pérez, Investigador del Instituto de Ciencias Forenses, que examinó dos (2) armas de fuego sometidas para evaluación. El quinto testigo fue Ángel Luis Ortiz, Investigador del Instituto de Ciencias Forenses, que declaró sobre un estudio que hizo de las perforaciones que tenía el vehículo donde viajaba el occiso.
Por el Recurrente, declaró el Agte. Eric González Sánchez, quien lo acompañaba al momento de ocurrir los hechos y declaró sobre éstos.
También se admitió diversa prueba documental, entre ésta, los informes de los investigadores del Instituto de Ciencias Forenses, un croquis de la escena y una certificación del arma asignada al Recurrente. A la luz de toda la prueba considerada por la CIPA se consignaron en su Resolución las siguientes determinaciones de hechos:
“El 23 de diciembre de 2002, el apelante Wilfredo Ríos Santiago #27628 junto al Agte. Eric González Sánchez #12814, ambos adscritos a la División de Vehículos Hurtados de Caguas, efectuaban patrullaje preventivo en el pueblo de Aguas Buenas. Mientras se encontraban en el negocio El Faro, alrededor de las 11:00 a.m., el Agte. González Sánchez #12814 vio pasar a exceso de velocidad un Malibú blanco en el cual viajaban dos individuos que no utilizaban el cinturón de seguridad. González Sánchez #12814 alcanzó a ver el número de tablilla del mencionado vehículo y lo informó al Centro de Mando. De acuerdo al Centro de Mando, ese vehículo había sido apropiado ilegalmente en la madrugada en el Municipio de Caguas.
Ríos Santiago #27628 y su compañero siguieron tras el Malibú que iba en ruta hacia la Carr. #173 de Cidra. La patrulla se apareó al vehículo y los agentes le ordenaron al conductor que se detuviera, lo cual éste no hizo. Se inició entonces una persecución durante la cual el apelante y su compañero dispararon hacia el otro auto en un intento por detenerlo. Finalmente, en el sector Montellanos, el Malibú se “barrió” quedando de frente a la patrulla de la policía. De inmediato; el conductor se desmontó y salió corriendo hacia un monte aledaño yéndose tras de él el apelante Ríos Santiago #27628 quien portaba en sus manos el arma de reglamento. El Agte. González Sánchez #12814 puso bajo arresto al pasajero identificado luego como Luis Nieves Meléndez y mientras intervenía con él, escuchó detonaciones provenientes del área hacia la que se habían internado el joven conductor del Malibú y el apelante. González Sánchez #12814 preguntó “Ríos ¿estás bien?” a lo que este último le contestó que sí. Cuando se aproximó al área vio a un joven tendido de lado en el suelo quien momentos después fue transportado por personal de emergencias médicas hasta el hospital Menonitas donde falleció. La víctima, Alexander Vargas Báez, murió de un disparo en la parte posterior de la cabeza.
De la investigación de la escena efectuada por el Tnte. Enrique Rivera Vega surgió que la patrulla no mostraba ningún impacto de bala mientras que el Malibú blanco tenía varios orificios. Ante la admisión de los agentes de haber hecho uso de sus armas de reglamento se les ocuparon junto a balas, casquillos y fragmentos levantados en la escena. La Dra. Yocasta Brugal, Patóloga Forense del Instituto de Ciencias Forenses, recuperó durante la autopsia un proyectil de bala (plomo) y un (1) blindaje de proyectil de bala. Los *967 análisis periciales posteriormente efectuados en la Sección de Armas del Instituto de Ciencias Forenses reflejaron que el disparo mortal fue efectuado por el apelante Wilfredo Ríos Santiago #27628 con su arma de reglamento.”
(Énfasis Suplido)
m
En virtud de su ley orgánica, la CIPA está facultada para actuar como cuerpo apelativo con jurisdicción exclusiva para oír y resolver apelaciones interpuestas por los funcionarios públicos cubiertos por la ley, cuando el jefe o director del organismo o dependencia de la que se trate les haya impuesto cualquier medida disciplinaria en relación con actuaciones cubiertas por la ley, o faltas graves en el caso de miembros de la Policía o de otras agencias que tengan reglamentación similar. Ley Núm. 32 de 22 de mayo de 1972, según enmendada. 3 L.P.R.A. sec. 171 y ss.
Al evaluar la corrección de las determinaciones formuladas por la CIPA, debemos tener presente que la revisión judicial de las determinaciones de hechos de una agencia administrativa está limitada por lo establecido en la See. 4.5 de la Ley de Procedimiento Administrativo Uniforme (LPAU), Ley Núm. 170 de 12 de 1988, 3 L. P.R.A. see. 2175. Esta disposición de ley establece que las determinaciones de hechos formuladas por las agencias administrativas serán sostenidas por los tribunales si están apoyadas en evidencia sustancial que obre en el expediente administrativo. Id.
De este modo, se acogió legislativamente la norma jurisprudencial de que, de ordinario, los tribunales no intervendrán con las determinaciones de hechos de un organismo administrativo si estas determinaciones están basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. El fin primordial de esta norma es evitar que el criterio de la agencia administrativa en materia especializada sea sustituido por el criterio del tribunal revisor. O.E.G. v. Rodríguez, 159 D.P.R. 98, 117-118 (2003).
Le correspondería a quien recurre de la decisión administrativa demostrar que en el expediente administrativo existe otra prueba que reduce o menoscaba el valor probatorio de la evidencia impugnada, hasta tal punto que no pueda concluirse que la determinación de la agencia fue razonable a la luz de la totalidad de la prueba que tuvo ante su consideración. Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 131 (1998); Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670, 686 (1953). De lo contrario, las determinaciones de la agencia deberán sostenerse por el tribunal revisor. Ramírez v. Depto. de Salud, 147 D.P.R. 901, 905 (1999); J.R.T. v. Escuela Coop. E.M. De Hostos, 107 D.P.R. 151, 156-157 (1978).
IV
El Recurrente cuestiona las determinaciones de hechos de la CIPA. Alega que el primer testigo nunca declaró ver al Recurrente disparar o hacer uso de su arma de reglamento. Que la conclusión de la CIPA de que dispararon al vehículo es incorrecta. Afirma que según el testimonio del Agte. González, testigo del Recurrente, éste nunca disparó al auto y nunca lo observó disparar hacia ningún objeto o persona. También alegó que la conclusión de la CIPA de que el Recurrente fue en persecución del occiso no tiene apoyo en la prueba. Además, cuestiona la determinación de la CIPA de aceptar como cierta la aseveración del investigador del Instituto de Ciencias Forenses de que el plomo y blindaje de proyectil que se usaron para análisis fueron ocupados en la autopsia, ya que. la patóloga no declaró ni se presentó el protocolo de autopsia..Argumenta que la actuación de los oficiales el día de los hechos fue legítima, en persecución de unos delincuentes y en defensa de sus vidas ante un inminente peligro de muerte. Finalmente concluye y citamos:
“No existe declaración alguna de alguien que haya dicho en la vista de Apelación que observó al Recurrente cometer delito contra otra persona o disparar indiscriminadamente contra un vehículo. La Resolución con fecha del mismo día de la vista manifiesta abuso de discreción de la Comisión, una clara confusión de los hechos y *968 dentro de su discreción otorgan una culpa inmerecida al Recurrente.
La argumentación del Recurrente parte de unas premisas equivocadas. En primer lugar, para establecer las faltas imputadas no era necesario establecer, de forma científica, la muerte del señor Alexander Vargas Báez. No se.trataba de un proceso penal de asesinato. En segundo lugar, los hechos que sostienen la decisión de la agencia, no tienen que ser establecidos con evidencia directa, pues pueden ser establecidos con evidencia indirecta o circunstancial. Por último, la Sec. 3.13 (d) de la LPAU, 3 L.P.R.A. see. 2163 (e), establece que las Reglas de Evidencia no serán aplicables a las vistas administrativas, sólo que los principios fundamentales de evidencia se podrán utilizar para lograr una solución rápida, justa y económica del procedimiento. Esta norma tiene como propósito liberar los procedimientos administrativos de las trabas procesales de los tribunales de justicia y cumple con el fin de promover el que éstas se lleven a cabo de manera ágil y sencilla.” O.E.G. v. Rodríguez, supra.
Examinada la transcripción de la vista y la prueba documental presentada se desprende que la decisión de la CIPA está fundamentada en evidencia sustancial y merece entonces nuestra deferencia judicial. Veamos.
El primer testigo, el joven Luis A. Nieves Meléndez, era quien acompañaba al occiso el día de los hechos. De parte de su examen directo, se desprende lo siguiente:
“P. ¿Quién los mandó a parar?
R. La policía.
P. ¿Y qué hicieron ustedes, si hicieron algo?
R. Luego el compañero mío me dijo que no se iba a parar.
P. ¿Y qué pasó?
R. Empezaron a... ahí empezó una balacera de parte de ellos hacia nosotros.
P. ¿Quiénes son ellos?
R. Los agentes.
P. ¿Qué agentes fueron?
R. El que está ahí y el otro policía.
P. Para efectos de récord, señor, su Señoría, señaló al Apelante. ¿Cómo fue esa balacera?
R. Pues, ellos empezaron a disparar contra nosotros.
P. ¿Y dónde estaban ustedes?
R. En el vehículo.
P. En el vehículo. ¿Y el vehículo estaba detenido o estaba en movimiento?
R. Estaba en movimiento.
*969 P. ¿Hacia dónde ustedes se movieron?
R. Nosotros seguimos hacia Cidra.
P. Hacia Cidra. ¿Llegaron a Cidra?
R. No.
P. No. ¿Por qué?
R. Pues, él, porque él paró y se bajó a correr.
P. ¿Quién, quién, quién paró?
R. El compañero mío.
P. ¿Sabe el nombre del compañero?
R. Alexander Vargas Báez.
P. Se detiene y él salió corriendo. ¿Qué pasó entonces?
R. Una vez él se va a correr, pues, escuché un disparo.
P. Perdone. Una vez se va a correr, ¿qué usted me contestó?
R. Una vez él se va a correr, que se tira por un montecito que hay, entonces escuché un disparo.
P. Escuchó un disparo. ¿Y qué, qué pasó entonces, después de ese disparo?
R. Ahí me detuvieron (sic) a mí y montaron en la patrulla.
Páginas 14-15 de la Transcripción de la vista ante la CIPA.”
(Énfasis Suplido)
Aunque durante el contrainterrogatorio del abogado del Recurrente el testigo aclara que no vio al Recurrente dispararle a Alexander Vargas Báez, señala que escuchó un disparo. A preguntas de los Comisionados, señaló que el oficial que lo detuvo a él fue el Agte. Eric González y éste no disparó en ese momento, que fue el Recurrente: “... el [que] sólo disparó.” Página 70, Transcripción de la vista.
Del testimonio del segundo testigo, Teniente Enrique Rivera Vega, se desprende que él llegó al lugar donde ocurrieron los hechos y le indicaron que había una persona fallecida. Señaló que pudo observar cuatro (4) casquillos de bala en diversos puntos del pavimento, tres (3) de ellos eran calibre .40 y uno (1) era calibre 9mm. Que se hizo una búsqueda en el lugar, en la cual participó un can de la policía, tratando de encontrar algún arma de fuego, pero ninguna fue localizada. [3] Como parte de la evaluación de la escena se verificó la patrulla, pero ésta no tenía impactos de bala. También acudió al Hospital Menonita donde había sido llevado el joven Alexander y su cuerpo mostraba laceraciones en la rodilla y “... un orificio en la parte posterior de la cabeza, aparentemente sin salida.” Página 83 de la Transcripción de la vista. Ante la expresión de los agentes de que habían utilizado sus armas, éstas fueron ocupadas. En ese momento hizo referencia al recibo del arma ocupada *970 al Recurrente que era una pistola Smith & Wesson, calibre .40, que fue ocupada junto a tres (3) cargadores (peines). De éstos, dos (2) tenían doce (12) balas sin disparar y el otro cuatro (4) balas sin disparar. Finalmente, señaló que en el área de la escena pudo visualizar lo que a base de su experiencia en Homicidios era masa encefálica y sangre.
La tercera testigo, Aida. I. Hernández Alemán, era la encargada de Propiedad y Armas de Fuego y certificó que el Recurrente tenía asignada una pistola Smith & Wesson, Modelo SW99, Calibre .40, con número de serie SAD1748.
El cuarto testigo, Carlos Rivera Pérez, fue el Investigador del Instituto de Ciencias Forenses, que realizó el análisis balístico con las armas de los dos agentes. Según este testigo, todos los casquillos y blindajes de proyectil ocupados, con características de comparación, fueron disparados entre las dos (2) armas de los agentes. En particular, el blindaje de proyectil recuperado en la autopsia de Alexander fue disparado por la pistola del Recurrente (SAD1748). Véase, páginas 69-70 de la Transcripción de la vista.
El quinto testigo, Ángel Luis Ortiz, también es investigador forense y efectuó un estudio del vehículo Chevrolet Malibú donde viajaban Alexander y Luis. Del Certificado de Análisis se desprende que dicho vehículo tenía múltiples perforaciones consistentes con el paso de proyectiles de bala disparados. También se recuperó del vehículo, un blindaje de proyectil, un proyectil de bala y un fragmento de bala. Uno de ellos, el fragmento de proyectil, según había declarado el testigo anterior, fue disparado por la pistola 9 mm., que era del compañero del Recurrente.
El Recurrente presentó como testigo al Agte. Eric González Sánchez. Éste declaró, que al ordenar detener el vehículo, por aparecer hurtado, su conductor no obedeció. Que escuchó unas detonaciones y se sintió en inminente peligro de muerte. Al escuchar los disparos respondió disparando a los neumáticos del Chevrolet. Según el Agte. González, mientras el vehículo estaba en marcha el conductor se bajó, por lo que le hizo varios disparos al vehículo para detenerlo. Finalmente, al detenerse el vehículo, intervino con el pasajero que era Luis Nieves Meléndez. Luego escuchó otras detonaciones en la parte de arriba, por lo que le preguntó al Agte. Ríos si estaba bien y éste contestó que sí. Durante el contrainterrogatorio indicó que el Agte. Ríos siguió detrás del conductor del Malibú. Que luego de haber escuchado las detonaciones en el área de arriba, va con su detenido al área donde estaba el Recurrente y observó la persona herida, pero no pudo percatarse si estaba sangrando. A preguntas de uno de los Comisionados indicó que no sabía decir qué hizo el Agte. Ríos durante la persecución de Alexander porque él estaba interviniendo con la otra persona, pero que sí escuchó varias detonaciones. También declaró que no se ocupó ninguna arma de fuego en el Malibú, ni en la persona que arrestó, ni en la persona que resultó herida y posteriormente falleció.
Del anterior resumen de la evidencia se desprende que la decisión de la CIPA de confirmar la destitución del Recurrente está sostenida por evidencia sustancial. Aunque el Agte. González pretendió en su testimonio establecer que durante la persecución fueron atacados, la evidencia física de la escena no es compatible con tal versión. La patrulla no tenía evidencia de impactos de bala, no se les ocupó a los jóvenes, ni dentro del vehículo, arma alguna. De la inspección del área tampoco se pudo recuperar ningún arma de fuego. Los casquillos recuperados y los blindajes de proyectiles que podían ser objeto de análisis, fueron disparados por las armas de los agentes. Uno de los cargadores ocupados al Recurrente sólo tenía cuatro (4) balas sin disparar cuando los otros tenían doce (12). Tanto el testigo Luis A. Nieves Meléndez como el Agte. González, señalaron que el Recurrente fue en persecución de Alexander cuando éste se bajo del vehículo.
De la evidencia sí se desprende un mal uso de sus armas de reglamentos, al dispararle al vehículo durante la persecución. La herida fatal de Alexander fue en la parte posterior de su cabeza y el blindaje recuperado de su cuerpo fue disparado con la pistola del Recurrente. Esa herida es compatible con un disparo a una persona de espalda durante una persecución, en circunstancias donde no hay evidencia de que su vida estuviera en peligro.
*971 La evidencia presentada ante la CIPA es suficiente para establecer las faltas imputadas al Recurrente, ya que cumple con el requisito de evidencia sustancial. 3 L.P.R.A. see. 2175. El concepto de evidencia sustancial se ha definido como “aquella [prueba] pertinente que una mente razonable puede aceptar como adecuada para sostener una conclusión.” Ramírez v. Dpto. de Salud, 147 D.P.R. 901 (1999). Los argumentos del Recurrente no menoscaban su valor probatorio hasta el punto que pueda concluirse que se trata de una determinación irrazonable. Otero v. Toyota, 163 D.P.R. 716 (2005). Por lo tanto, las determinaciones de hechos de la CIPA no deben ser descartadas y merecen ser respetadas. Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85 (1997).
V
De conformidad con los fundamentos antes expuestos, se confirma la Resolución de la Comisión de Investigación de Procesamiento y Apelación.
Lo acordó el Tribunal y lo certifica la Secretaria.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2010 DTA 41

. Entregada el 5 de noviembre de 2004.

. De la comunicación también se desprende que contra el Recurrente se había iniciado un proceso penal, habiéndose determinado causa probable para arresto por Asesinato en segundo grado. El 12 de marzo de 2008 fue declarado no culpable por el Tribunal de Primera Instancia, Sala de Caguas. Aunque no está en controversia, es norma establecida por el Tribunal Supremo que la absolución en un proceso penal no impide que se destituya a un funcionario o empleado público en un proceso administrativo basado en los mismos hechos que motivaron la acción penal, pues lo contrario sería atar las manos a todo funcionario nominador y privarle de las prerrogativas que la ley le reconoce en materia de destituciones. San Vicente v. Policía de P.R., 142 D.P.R. 1 (1996).

. Esta búsqueda respondió a la versión de los agentes de que habían sido objeto de disparos con un arma de fuego.