EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Vecinos Tulip/Monteverde, Inc.: Clara Emilia Frontera De Guerra, Nilsa Iris López de Laureano; Efrén de Jesús García; Asociación de Residentes Urb. Campiña; Comisión De Ciudadanos al Rescate de Caimito, Inc., Etc.<br><br>Demandantes Recurridos<br><br>v.<br><br>Junta de Planificación de Puerto Rico; José A. López Pérez, Rubén Mercado Brignoni<br><br>Demandados Peticionarios | Certiorari<br><br>2007 TSPR 141<br><br>171 DPR \_\_\_\_ |

Número del Caso: CC-2005-346

Fecha: 19 de julio de 2007

Tribunal de Apelaciones:

        Región Judicial de San Juan

Juez Ponente:

        Hon. Carlos J. López Feliciano

Abogados de la Parte Peticionaria:

        Lcdo. Bartolo Rodríguez
        Lcda. Everlidys Rodríguez Pacheco

Abogados de la Parte Recurrida:

        Lcdo. José Luis González Castañer
        Lcdo. Denis D. Martínez Colón

Materia: Revisión Administrativa procedente de la Junta de Planificación de Puerto Rico

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Vecinos Tulip/Monteverde, Inc.: Clara Emilia Frontera De Guerra, Nilsa Iris López de Laureano; Efrén de Jesús García; Asociación de Residentes Urb. Campiña; Comisión de Ciudadanos al Rescate de Caimito, Inc., Etc.<br>     Demandantes Recurridos<br><br>v.<br><br>Junta de Planificación de Puerto Rico; José A. López Pérez, Rubén Mercado Brignoni<br>     Demandados Peticionarios | CC-2005-346 |

SENTENCIA

San Juan, Puerto Rico, a 19 de julio de 2007.

Se nos solicita la revisión de una Sentencia emitida por el Tribunal de Apelaciones, Región Judicial de San Juan, mediante la cual revocó una Resolución emitida por la Junta de Planificación de Puerto Rico, que aprobó una consulta de ubicación para el proyecto propuesto por los peticionarios. Veamos los hechos acaecidos que originan el presente recurso.

I

En el año 2001, el señor José A. López Pérez, en adelante señor López Pérez, por conducto del señor Jesús Conde, en adelante señor Conde,

sometieron a la consideración de la Junta de Planificación de Puerto Rico, en adelante La Junta, la Consulta Número 2001-17-0371-JPU para la ubicación de un proyecto residencial multifamiliar en una finca con cabida de 2.3998 cuerdas que radica en la Calle Tulip, Alturas de Borinquen Gardens en el Municipio de San Juan.[1] El 9 de enero de 2002, la Junta emitió Resolución denegando dicha consulta.[2] La Junta determinó que:"…el proyecto propuesto no cumplía con los Objetivos y Políticas Publicas del Plan de Uso de Terrenos de Puerto Rico ni con la calificación y clasificación del Plan de Ordenación de San Juan…"[3]

El 24 de abril de 2002, el señor López Pérez, por conducto del señor Rubén Mercado Brignoni, en conjunto la parte proponente, sometió ante la consideración de la Junta la Consulta número 2002-17-0363-JPU, para la ubicación del mismo proyecto que había sido sometido en la Consulta número 2001-17-0371-JPU.[4] Se utilizarían las mismas 2.3998 cuerdas para ubicar un proyecto de desarrollo residencial de setenta (70) apartamentos, distribuidos en cuatro (4) edificios.[5]

El 26 de junio de 2002, la Junta emitió una Resolución mediante la cual acordó dejar en suspenso la consulta presentada por la parte proponente hasta tanto dicha parte

---

[1] Apéndice del recurso de *Certiorari*, págs. 147-148.

[2] Íd.

[3] Íd.

[4] Íd., pág. 149-158.

[5] Íd.

CC-2005-346

demostrara la diferencia entre el nuevo proyecto y el proyecto previo, ya evaluado y denegado.[6] El 29 de agosto de 2002, la Junta concedió a la parte proponente treinta (30) días adicionales para que sometiera una serie de documentos necesarios para la celebración de una vista pública.[7] Ese mismo día, la Asociación de Vecinos Tulip/Monteverde, Inc., presentó su oposición al proyecto propuesto y solicitó que se le notificara de cualquier trámite de vista o revisión relacionado con el proyecto. El 30 de octubre de 2002, la Junta declaró con lugar la solicitud de intervención de la Asociación de Vecinos de Tulip/Monteverde, Inc.[8]

El 24 de febrero de 2003 se celebró una vista pública en la Junta, presidida por la Oficial Examinadora, licenciada Vanesa García Quiñones, en la cual las partes interesadas presentaron sus planteamientos en torno al propuesto proyecto.[9]

La Junta permitió que la Sra. Haydee Colón, en representación de la Comisión de Ciudadanos al Rescate de Caimito, Inc., y los vecinos de la Urbanización La Campiña, pudieran intervenir como partes interesadas en la consulta.[10] El 15 de diciembre de 2003, la Oficina de Asuntos Legales de la Junta emitió un informe sobre la audiencia pública celebrada el 24 de febrero de 2003. La Oficial Examinadora

---

[6] Íd., pág. 158.

[7] Íd., págs. 164-165.

[8] Íd., págs. 167-168.

[9] Íd., pág. 169.

[10] Íd., págs. 171-175.

concluyó en dicho informe, entre otras cosas, que la "Quebrada Cheo" ubicaba en el terreno del proyecto propuesto, durante aguaceros fuertes, inundaba la marginal al fondo de la calle Tulip.[11] Sostenido por comentarios emitidos por algunas de las agencias administrativas que evaluaron el proyecto se expresó lo siguiente:

1. La Autoridad de Energía Eléctrica, en adelante A.E.E., indicó que no tenía objeción a que se aprobara el proyecto. Indicó, además, que la parte proponente debía obtener el endoso de la División de Servicios de Riego, Represas y Embalses de la A.E.E.[12]

2. La Autoridad de Acueductos y Alcantarillados, en adelante A.A.A., indicó que no endosaba el proyecto, ya que la parte proponente nunca respondió a una comunicación que se le envió. En esa comunicación se le inquirió a que formara parte de un grupo de empresas que están desarrollando proyectos en la misma área para realizar mejoras al sistema de acueductos del Barrio Caimito.[13]

3. La carta del Departamento de Recursos Naturales y Ambientales, en adelante D.R.N.A., evaluó la primera consulta del proyecto. Manifestó que el proyecto debía cumplir con el Reglamento de Planificación #25 (Reglamento de Siembra, Corte y Forestación de Puerto Rico). Señaló, además, que debido a que el proyecto colindaba con una quebrada, se debía dedicar

---

[11] Íd., págs. 176-188.

[12] Íd., pág. 394.

[13] Íd., págs. 189-190.

a uso público una franja de terreno, más una adicional. Se requirió obtener de la Junta de Calidad Ambiental, en adelante J.C.A., el permiso para el control de erosión y sedimentación, y cualquier otro permiso requerido por dicha agencia. Se indicó, además, que una vez tomadas en consideración las recomendaciones antes expuestas, el D.R.N.A. no tenía objeción al desarrollo preliminar del proyecto propuesto. [14]

4. El Instituto de Cultura Puertorriqueña, en adelante I.C.P., exhortó a la parte proponente a radicar en la División de Arqueología del I.C.P. una solicitud de evaluación arqueológica y pagar la cuota correspondiente, a tenor con el Reglamento para la Radicación y Evaluación Arqueológica de Proyectos de Construcción y Desarrollo.[15]

5. La Autoridad de Carreteras y Transportación, en adelante A.C.T., indicó que el proyecto no se afectaba por vías propuestas en el Plan Vial de la Región Metropolitana de San Juan. Se le requirió a la parte proponente que consultara al Municipio de San Juan con relación a los accesos y mejoras a las vías municipales. Se le solicitó, además, una aportación conforme lo dispuesto bajo el Reglamento de las Nuevas Competencias para Viabilizar el Desarrollo Urbano (Reglamento de Planificación Número 21).[16]

---

[14] Íd., págs. 225-226.

[15] Íd., pág. 191.

[16] Íd., pág. 182.

CC-2005-346

6. El Municipio de San Juan, indicó que ya había comentado sobre dicho proyecto en la consulta número 2001-17-0371-JPU.[17]

En su informe, la Oficial Examinadora determinó que el proyecto cumplió con el requisito del Reglamento de Ordenación Territorial de San Juan[18] que dispone que los terrenos del proyecto propuesto tengan que estar localizados o colindar con el área desarrollada dentro del ámbito de expansión urbana.[19] También se determinó que el proyecto cumplió con todo el trámite administrativo que se desprendía del expediente administrativo.[20] Sin embargo, la Oficial Examinadora determinó que la topografía del predio era accidentada, por lo que, durante la fase de construcción, se podía anticipar movimiento de tierra.[21] Dicha actividad, a su vez, podría ocasionar el arrastre de sedimentación, erosión, generación de polvo, deforestación y problemas de inundaciones en el sector. Indicó, además, que la parte proponente no sometió plan alguno de acción para atender dicha posible situación.[22]

Conforme a estos señalamientos, la Oficial Examinadora concluyó que la parte proponente no pudo demostrar ningún

---

[17] Íd.

[18] Reglamento de Ordenación Territorial de San Juan, con vigencia de 28 de marzo de 2003.

[19] Apéndice del Recurso de *Certiorari*, págs. 184-185.

[20] Íd., pág. 185.

[21] Íd., pág. 186.

[22] Íd.

CC-2005-346

beneficio significativo que brindaría su proyecto al desarrollo del sector o la infraestructura del mismo.[23] Tomando en consideración las determinaciones de hechos y conclusiones de derecho, **no recomendó** la aprobación del proyecto.[24]

El 21 de enero de 2004, la Junta refirió el documento de evaluación ambiental, presentado por la parte proponente, a la J.C.A. para su evaluación.[25]

El 20 de febrero de 2004, la J.C.A., notificó, mediante carta, el cumplimento del proyecto con el Artículo 4(c) de la Ley Sobre Política Pública Ambiental[26] sujeto a que se acataran ciertas medidas de mitigación y requerimientos de varias agencias.[27]

El 2 de marzo de 2004, la parte proponente sometió a la Junta información adicional con respecto a la infraestructura del proyecto. Acompaño además, planos en donde se reducía la cantidad de apartamentos a sesenta y tres (63) y se modificaron el número de estacionamientos a setenta (70).[28]

El 3 de marzo de 2004, la Junta concedió treinta (30) días a la parte proponente para que sometiera evidencia de que era parte del grupo de empresas que se disponían a

---

[23] Íd.

[24] Íd., pág. 187.

[25] Íd, págs. 192-239.

[26] Ley Número 9, del 18 de junio de 1980, según enmendada.

[27] Apéndice del Recurso de *Certiorari*, págs. 31-32.

[28] Íd., págs. 243-268.

CC-2005-346

realizar proyectos para beneficio de la infraestructura de la A.A.A.[29]

El 15 de marzo de 2004, la parte proponente sometió una comunicación escrita a la A.A.A. relacionada al requisito de pertenecer al combinado de desarrolladores de proyectos para la A.A.A.[30] En la misma, la parte proponente informa que el ingeniero Ramón Flores de la A.A.A., le había indicado en el pasado que el grupo de empresas ya tenían los proyectos en etapas finales y era difícil entrar en ese momento en el mismo. También se informó que el ingeniero Flores, en ese momento, solicitó los planos que ilustraran la toma de agua más cercana al proyecto. Se informó además, que la consulta del proyecto estaba a la espera del visto bueno de la A.A.A.

El 26 de abril de 2004, la Asociación de Vecinos Tulip/Monteverde, Inc. sometió a la Junta una segunda oposición al proyecto.[31] Argumentaron, entre otras cosas, que setenta (70) estacionamientos son insuficientes para sesenta y tres (63) apartamentos. Esto, alegadamente provocaría que se usara la vía pública como estacionamiento y agravaría el ya existente problema de congestión vehicular.

El 17 de mayo de 2004, la Junta ordenó a la parte proponente re-diseñar el proyecto de manera tal que cumpliera con los estacionamientos requeridos.[32] En cumplimiento con

---

[29] Íd., págs. 241-242.

[30] Íd., págs. 269-270.

[31] Íd., págs. 272-274.

[32] Íd., págs. 292-294.

dicha orden, el 2 de junio de 2004, la parte proponente sometió un nuevo diseño del proyecto con noventa (90) estacionamientos.[33]

El 4 de junio de 2004, la Junta emitió una resolución mediante la cual determinó que era viable el desarrollo de los terrenos para el uso propuesto, por lo que aprobó la consulta para la ubicación del proyecto.[34] Luego de todos los incidentes procesales, la Junta formuló las correspondientes determinaciones de hechos. Determinó que todas las agencias concernidas le impartieron su aprobación al proyecto; que cumplía con los requisitos de zonificación según el Plan de Ordenación Territorial del Municipio de San Juan; que el predio objeto de la consulta muestra un comportamiento con marcada tendencia al desarrollo residencial; que los desperdicios sólidos serián recogidos por una compañía privada durante la etapa de construcción y el proyecto estaba fuera del área alegadamente inundable. A raíz de esto, la Junta determinó que el proyecto era uno viable. Sin embargo, emitió una serie de comentarios y recomendaciones que la parte proponente tendría que cumplir para obtener la aprobación del proyecto de construcción de la Autoridad de Reglamentos y Permisos, en adelante A.R.P.E. Entre ellas, señaló que el proyecto tenía que cumplir con los requerimientos de estacionamientos aplicables; las recomendaciones de la J.C.A.; tomar medidas necesarias para

---

[33] Íd., págs. 295-297.

[34] Íd., págs. 298-311.

evitar que residuos de sustancias orgánicas e inorgánicas tengan acceso a cualquier cuerpo de agua o al sistema pluvial; coordinar con la A.A.A. para la conexión del proyecto y cumplir con las recomendaciones y requisitos de varias agencias. La Junta no adoptó las determinaciones ni las conclusiones que formuló la Oficial Examinadora en su informe.

Inconformes, el 8 de julio de 2004, la Asociación de Vecinos Tulip/Monteverde presentó un escrito de reconsideración ante la Junta.[35] En la misma, los vecinos le advirtieron a la Junta, sobre la imposibilidad de que el proyecto pudiera ser construido en el terreno propuesto. Alegaron, entre otras cosas, que se presentaron planos incorrectos; discrepancia en la ubicación de la quebrada y la franja de diez (10) metros requeridas; la omisión de una servidumbre de cables eléctricos; problemas de estacionamiento y otras discrepancias contenidas en la autorización de la Junta.

El 14 de julio de 2004, la Junta determinó acoger la solicitud de reconsideración presentada por los vecinos.[36] El 23 de agosto de 2004, la parte proponente presentó una oposición a la solicitud de reconsideración.[37] En ella argumentó, entre otras cosas, que muchas de las preocupaciones de los vecinos ya fueron atendidas, razón por

---

[35] Íd., pág. 321-333.

[36] Íd., pág. 334.

[37] Íd., págs. 340-343.

la cual la Junta aprobó el proyecto; que se dejaría un área entre la quebrada y la construcción; que se levantaría un muro de contención para evitar desprendimiento de tierra; que se realizarían estudios técnicos para probar estabilidad del suelo; que se había rediseñado el proyecto para atemperarlo a las condiciones del sector; y que todos los vecinos del proyecto habían sido notificados como se exigía.

El 4 de octubre de 2004, la licenciada Aida Silver Cintrón de la Oficina de Asuntos Legales de la Junta, emitió una opinión legal en torno a la moción de reconsideración.[38] Recomendó que se re-examinara por la unidad técnica de la agencia los planteamientos de densidad y que se asegurara el cumplimiento con lo aprobado. Recomendó, además, celebrar una inspección ocular del predio para aclarar los planteamientos de los vecinos y de la parte proponente.

El 8 de octubre de 2004, la Junta determinó prorrogar el término para resolver las solicitudes de reconsideración acogidas y mantener en suspenso la consulta hasta tanto la parte proponente se expresara sobre las preocupaciones de los vecinos. Además, se ordenó la celebración de una vista ocular a la cual debían comparecer la Unidad de Hidrología y la Oficina de Asesores Legales de la Junta.[39]

---

[38] Íd., págs. 351-353.

[39] Íd., págs. 47-48, 356-358.

El 25 de octubre de 2004, la parte proponente, en cumplimiento con la orden del 8 de octubre de 2004, se expresó en torno a las preocupaciones de los vecinos.[40]

La vista ocular se realizó en los predios en cuestión el 21 de octubre de 2004. El 27 de octubre de 2004, se redactó el Acta de Inspección Ocular, en adelante "El Acta", y se presentó ante la Junta el 9 de noviembre de 2004[41]

El 10 de noviembre de 2004 la Junta dictó una Resolución mediante la cual denegó las solicitudes de reconsideración presentadas por los opositores al proyecto, y se reafirmó en la aprobación de la consulta.[42]

Ante la determinación desfavorable, los vecinos acudieron al Tribunal de Apelaciones mediante un recurso de revisión.[43] El 27 de enero de 2005, notificada el 7 de febrero de 2005, el foro intermedio apelativo emitió Sentencia revocando la Resolución de la Junta autorizando el proyecto. Determinó que a base de la prueba presentada no procedía autorizar la consulta. En esencia, adoptó los datos recogidos en el informe del 15 de diciembre de 2003 de la Oficial Examinadora de la Junta. Sostuvo que la A.A.A. no había endosado el proyecto ya que no se contaba con la infraestructura necesaria; que no se modificó el proyecto para cumplir con el requisito de crear una franja de amortiguamiento de diez (10) metros entre la quebrada y él

---

[40] Íd., págs. 359-363.

[41] Íd., págs. 373-379.

[42] Íd., págs. 398-401.

[43] Íd., págs. 112-397.

mismo; que no se explicó la razón para descartar el informe de la Oficial Examinadora en violación al debido proceso de ley; que la parte proponente del proyecto no formó parte del combinado de empresas y desarrolladores de la A.A.A.; que el proyecto propuesto se aprobó en documentos relacionados a la primera consulta que fue denegada; y que la Junta abusó de su discreción al aprobar la consulta, ya que sus conclusiones no estaban respaldadas por las determinaciones de hechos, como tampoco sustentadas por los documentos y el informe de la Oficial Examinadora.

Insatisfecho, el peticionario acude ante nos mediante recurso de *Certiorari*, alegando la comisión de los errores siguientes:

**A. ERRÓ EL HONORABLE TRIBUNAL DE APELACIONES AL REVOCAR LA RESOLUCIÓN EMITIDA POR LA JUNTA DE PLANIFICACIÓN EL 4 DE JUNIO DE 2004.**

**B. ERRÓ EL TRIBUNAL DE APELACIONES AL CONCLUIR QUE EL DICTAMEN DE LA JUNTA DE PLANIFICACIÓN NO SE APOYÓ EN LA TOTALIDAD DEL EXPEDIENTE.**

**C. ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMINAR QUE LAS CONCLUSIONES DE LA JUNTA DE PLANIFICACIÓN NO ESTÁN RESPALDADAS POR LAS DETERMINACIONES DE HECHOS, COMO TAMPOCO ESTÁN SUSTENTADAS POR LOS DOCUMENTOS.**

Con el beneficio de la comparecencia de las partes, estamos en posición de resolver los asuntos traídos ante nuestra consideración. Veamos.

CC-2005-346

II

A.

La revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurarse que éstas desempeñen sus funciones conformes a la ley.[44] Al evaluar la decisión de una agencia, el tribunal debe determinar si ésta actuó arbitraria, ilegal o de forma tan irrazonable que sus actuaciones constituyeron un abuso de discreción.[45] El criterio rector será la razonabilidad de la agencia recurrida. Así pues, al realizar su función revisora el tribunal está obligado a tomar en cuenta la especialización y experiencia de la agencia sobre las cuestiones que tuviera ante sí.[46] Al evaluar los casos, es necesario distinguir entre cuestiones de interpretación estatutaria, en la que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa.[47] Cuando una agencia interpreta un estatuto que viene llamada a poner en vigor de forma tal que

_____

[44] Torres Acosta v. Junta Examinadora de Ingenieros, 161 D.P.R. ____, 2004 T.S.P.R. 65, 2004 J.T.S. 71; Miranda v. C.C.C., 141 D.P.R. 775, 786 (1996).

[45] Torres Acosta v. Junta Examinadora de Ingenieros, supra; Franco v. Departamento de Educación, 148 D.P.R. 703, 710 (1988).

[46] Rebollo Vda. de Liciaga v. Yiyi Motors, 161 D.P.R. _____ (2004), 2004 T.S.P.R. 2, 2004 J.T.S. 4.

[47] Adorno Quiles V. Hernández, 126 D.P.R. 191, 195 (1990); Rebollo Vda. de Liciaga v. Yiyi Motors, supra.

CC-2005-346

produce resultados contrarios al propósito de esa ley, dicha interpretación no prevalece.[48]

La revisión de las determinaciones de hechos está limitada por lo establecido en la sección 4.5 de la Ley de Procedimiento Administrativos Uniforme, en adelante L.P.A.U., que dispone lo siguiente[49]:

"2175. Alcance

El Tribunal podrá conceder el remedio apropiado si determina que el peticionario tiene derecho a un remedio.

Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo." (Énfasis Nuestro)

Siempre y cuando estén sustentadas por evidencia sustancial[50] que obre en el récord administrativo, las determinaciones de hechos formuladas por la agencia serán sostenidas.[51] Esto es así, porque las decisiones de las agencias administrativas tienen a su favor una presunción de legalidad y corrección, la cual debe ser respetada por los tribunales mientras la parte que la impugna no produzca

---

[48] Mun. De San Juan v. J.C.A., 149 D.P.R. 263, 279-280 (1999).

[49] Ley de Procedimiento Administrativos Uniforme, Ley Núm. 170 del 12 de agosto de 1988, según enmendada, 3 L.P.R.A. secs. 2101 *et seq*.

[50] "Evidencia Sustancial" es aquella relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. Rebollo Vda. de Liciaga v. Yiyi Motors, *supra*; Misión Ind. P.R. v. J.P., *supra*.

[51] Torres Acosta v. Junta Examinadora de Ingenieros, *supra*; O.E.G. v. Rodríguez Martínez, 159 D.P.R.____ (2003), 2003 T.S.P.R. 48, 2003 J.T.S. 51, Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 121.

suficiente evidencia como para derrotarla.[52] No obstante, las conclusiones de derecho son revisables en todos sus aspectos.[53] "Esto no significa, sin embargo, que al ejercer su función revisora, el tribunal pueda descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. Al contrario hemos reiterado consistentemente antes y después de la vigencia de la L.P.A.U.-que, de ordinario, los tribunales deben deferencia a las interpretaciones y conclusiones de los organismos administrativos."[54] Si de la totalidad del récord administrativo se sostienen las determinaciones adoptadas por el foro administrativo, los tribunales no deben sustituirlas por su propio criterio.[55]

El proceso de revisión judicial comprende tres (3) áreas: (1) La concesión del remedio apropiado; (2) la revisión de las determinaciones de hecho conforme al criterio de evidencia sustancial; y (3) la revisión de las conclusiones de derecho.[56] El récord administrativo constituirá la base exclusiva para la acción de la agencia en

---

[52] Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 210 (1987); M.&B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987).

[53] Torres Acosta v. Junta Examinadora de Ingenieros, *supra*; O.E.G. v. Román González, 159 D.P.R.____ (2003), 2003 T.S.P.R. 70, 2003 J.T.S. 74.

[54] Rebollo Vda. de Liciaga v. Yiyi Motors, *supra*.

[55] Íd.

[56] Torres Acosta v. Junta Examinadora de Ingenieros, *supra*; Mun. De San Juan v. J.C.A., *supra*.

un procedimiento adjudicativo y para la revisión judicial ulterior.[57]

Finalmente, sobre este tema, el foro judicial podrá sustituir el criterio de la agencia por el propio sólo en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa.[58] "No obstante, es axioma judicial que ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio."[59]

B.

La Ley Orgánica de la Junta de Planificación autoriza a la Junta a hacer determinaciones sobre los usos de terrenos dentro de los límites territoriales de Puerto Rico.[60] En áreas zonificadas, la consulta de ubicación es el procedimiento mediante el cual la Junta pasa juicio sobre propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable, pero que las disposiciones reglamentarias proveen para que se consideren.[61] La consulta de ubicación es pública o privada

---

[57] Mun. De San Juan v. J.C.A., *supra*.

[58] Rebollo Vda. de Liciaga v. Yiyi Motors, *supra.*

[59] Íd.; Dye Tex de P.R. v. Royal Ins. Co., 150 D.P.R. 658 (2000); Rodríguez Roldán v. Mun. De Caguas, 133 D.P.R. 694 (1993).

[60] Ley Orgánica de la Junta de Planificación, Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. § 22 *et seq*.

[61] Hernández v. Centro Unido de Detallistas, Etc., 168 D.P.R. _____ (2006), 2006 T.S.P.R. 131, 2006 J.T.S. 140.

dependiendo de quién la origina, e incluye los proyectos de desarrollo extensos a considerarse bajo las disposiciones reglamentarias vigentes.[62]

Al estudiar, tramitar y resolver una consulta de ubicación, la Junta tomará en consideración los documentos siguientes: La Ley Orgánica de la Junta[63]; la Ley de Municipios Autónomos[64]; planes regionales adoptados por la Junta; los objetivos y políticas del Plan de Usos de Terrenos de Puerto Rico; los mapas de zonificación y de zonas susceptibles a inundaciones; planes de usos de terrenos; los planes de ordenación territorial; los usos existentes en el sector; la situación de la infraestructura física y social en el lugar; distancia entre los terrenos y las áreas construidas y la importancia agrícola o ambiental de los terrenos; rasgos topográficos; densidad poblacional; y otras condiciones sociales, económicas y físicas análogas, entre otros.[65]

La sección 7.01 del Reglamento de Procedimientos Adjudicativos de la Junta, *supra*, dispone lo siguiente:

> "La aprobación de una consulta pública
> no implica, en forma alguna, la
> aprobación del proyecto de transacción

---

[62] Sección 2.00 del Reglamento de Zonificación de Puerto Rico, Reglamento Núm. 6211, efectivo el 5 de noviembre de 2000.

[63] Ley Núm. 75 del 24 de junio de 1975, según enmendada.

[64] Ley Núm. 81 del 30 de agosto de 1991, según enmendada.

[65] Sección 7.01 del Reglamento de Procedimientos Adjudicativos, Reglamento Núm. 6031, efectivo el 12 de noviembre de 1999.

> o de construcción en sí, el cual deberá regirse por lo establecido en este Reglamento y por cualquier Resolución de la Junta, eximiendo de la presentación a tal proyecto de transacción o de construcción. No obstante, lo anterior, la Junta podrá autorizar conjuntamente con la consulta de ubicación para el uso de terrenos, la transacción correspondiente a solicitud de agencia proponente o podrá delegar en la A.R.P.E. la transacción conjuntamente con las etapas posteriores en la A.R.P.E."[66]

C.

La Junta puede ordenar la celebración de vistas administrativas a iniciativa propia o a petición de partes, o vistas públicas en cualquier caso que entienda que merece seguir ese procedimiento, cuando así lo establezca la reglamentación o legislación vigente.[67]

Sin embargo, las agencias, como la Junta, no están obligadas a adoptar las conclusiones y recomendaciones de sus oficiales examinadores.[68] La función de un oficial examinador consiste en celebrar una vista pública a la cual comparecen las partes y, una vez terminada la prueba, rendir un informe detallado a la agencia expresándole su recomendación.[69] La agencia tiene la facultad estatutaria para dictaminar sobre las cuestiones en controversia a base

---

[66] Íd.

[67] Íd.

[68] Henríquez v. Consejo de Educación Superior, *supra*.

[69] Baudilio Rivera v. J.R.T., 70 D.P.R. 342, 345-346 (1949).

de su propia consideración del récord.[70] El informe del oficial examinador no pasa de ser una mera recomendación, la cual la agencia, de acuerdo con la ley que la creó y con su propio reglamento, tiene discreción para alterar.[71] Esto no quiere decir que las conclusiones del oficial examinador no merecen consideración en la revisión judicial. Esto es así, ya que dichas conclusiones forman parte del récord administrativo. Además, cuando el informe del oficial examinador es contrario e incompatible con el de la agencia, particularmente en cuestiones que dependen del contacto inmediato con la prueba, la función revisora de los tribunales debe tornarse más rigurosa.[72]

### III

Con el trasfondo normativo antes expuesto, pasamos a resolver si erró el Tribunal de Apelaciones al revocar la resolución de la Junta aprobando el proyecto propuesto.

En su sentencia, el foro intermedio apelativo señaló que la resolución de la Junta del 4 de junio de 2004, aprobando el proyecto propuesto, descartó las recomendaciones de la oficial examinadora del 15 de diciembre de 2003, sin detallar las razones para tal curso de acción. Diferimos. Veamos.

---

[70] Henríquez v. Consejo de Educación Superior, *supra*.

[71] Baudilio Rivera v. J.R.T., *supra*; Hernández García v. J.R.T., 94 D.P.R. 22, 28 (1967).

[72] Íd.; J.R.T. v. Escuela Cooperativa Eugenio María de Hostos, 107 D.P.R. 151, 157 (1978).

En la resolución de la Junta del 4 de junio de 2004, la Junta expuso un resumen de los hechos del caso, sus propias determinaciones de hechos y conclusiones de derecho. En sus determinaciones de hechos, la Junta determinó, entre otras cosas, lo siguiente: Que el proyecto ubicaría en un terreno con cabida de 2.3998 cuerdas; que el área aledaña al predio objeto de consulta muestra un comportamiento con marcada tendencia al desarrollo residencial; que los terrenos bajo consulta están dentro del área de expansión urbana del Municipio de San Juan; que el terreno está clasificado como suelo urbano y calificado en un distrito de ordenación residencial uno (R-1); que el acceso vehicular sería a través de la Calle Tulip; que los desperdicios sólidos serían recogidos por una compañía privada durante la etapa de construcción; que el cuerpo de agua conocido como "Quebrada Cheo" ubica en el fondo del terreno del proyecto propuesto; que varias agencias sometieron sus comentarios al proyecto; que la topografía del terreno es accidentada y que el proyecto propuesto ubicaría en el lote del terreno que contiene una franja estrecha con el mismo nivel de la calle; que el desarrollo propuesto tendría un costo aproximado de $2,450,000 y generaría aproximadamente cien (100) empleos en la etapa de construcción y unos diez (10) en la etapa operacional; que el predio ubica fuera del área inundable; y que la J.C.A. certificó el cumplimiento con la Ley sobre Política Pública Ambiental, *supra*.

En sus conclusiones, la Junta determinó, entre otras cosas, lo siguiente: Que el proyecto estaba en armonía con varias metas y objetivos del Plan de Usos del Terreno de la Región Metropolitana de San Juan; que el proyecto propuesto se encontraba en una posición céntrica dentro de un área de pleno desarrollo; que el proyecto contaba con la infraestructura necesaria para obtener acceso a la carretera y obtener los servicios de energía eléctrica; que el proyecto cumplía con la densidad poblacional establecida por el Plan de Ordenación Territorial y que se cumplió con la notificación a los dueños de terrenos colindantes.

La Junta acordó, entre otras cosas, lo siguiente: Que A.R.P.E. determinaría cuál será la próxima etapa en el trámite del proyecto; que previo a dar comienzo con la construcción se debía obtener de la J.C.A. permisos para el polvo fugitivo, permiso para realizar una actividad generante de desperdicios sólidos y permiso para el control de erosión y prevención de sedimentación; que se deberían tomar medidas necesarias para evitar que sustancias orgánicas e inorgánicas ganaran acceso a cualquier cuerpo de agua o sistema pluvial; que se debía cumplir con el Reglamento de Siembra, Corte y Reforestación de Puerto Rico[73]; que se debía coordinar con la A.A.A. para la conexión del proyecto; que se debía cumplir con las recomendaciones del D.R.N.A. contenidas en su carta fechada 26 de junio de 2001; que el almacenaje, manejo y disposición de los desperdicios sólidos debía realizarse de

---

[73] Reglamento de Siembra, Corte y Reforestación de Puerto Rico, #5922, con vigencia el 24 de noviembre de 1998.

CC-2005-346

conformidad con la reglamentación vigente; y que se debía cumplir con disposiciones reglamentarias de la Junta, el Reglamento de Ordenamiento Territorial de San Juan[74] y la Ley de Reciclaje[75].

Las conclusiones y determinaciones de hechos a las que llegó la Junta en su resolución final son completas, detalladas, y minuciosas. El sostener que la Junta descartó las recomendaciones de la Oficial Examinadora sin base para hacerlo es incorrecto. La Junta emitió una resolución final de trece (13) páginas detallando porqué aprobó el proyecto propuesto. Aunque fueron descartadas, entendemos que las recomendaciones de la Oficial Examinadora fueron consideradas por la Junta durante la preparación de la resolución final. El hecho que la resolución final de la Junta hizo referencia a señalamientos específicos del informe de la Oficial Examinadora, es evidencia de por sí, de que se tomó en consideración del informe de la Oficial Examinadora al momento de emitir la resolución final. Además, no podemos olvidar que el informe de la Oficial Examinadora no pasa de ser una mera recomendación, la cual la Junta, tiene discreción de alterar o hasta ignorar. La Junta no está obligada a adoptar las conclusiones y recomendaciones de sus oficiales examinadores.[76]

---

[74] Reglamento de Ordenación Territorial de San Juan, *supra*.

[75] Ley para Reducción y Reciclaje de Puerto Rico, Ley Núm. 70 de 18 de septiembre de 1992, según enmendada.

[76] Henríquez v. Consejo de Educación Superior, *supra*.

Repasemos algunas divergencias específicas entre el informe de la Oficial Examinadora y la resolución de la Junta.

El informe de la Oficial Examinadora indicó que el proyecto propuesto no contaba con la infraestructura necesaria, ya que en la carta de 14 de febrero de 2003 la A.A.A. indicó que no endosaba el proyecto. La Junta reconoció en su resolución la ausencia del endoso de la A.A.A. La parte proponente explicó que cuando se le solicitó que se uniera al Combinado de Desarrolladores de la A.A.A. ya era muy tarde. Sostuvo que era difícil unirse al grupo por la etapa en que se encontraba el desarrollo de los proyectos. Es evidente, que la Junta aceptó esta explicación y aprobó la consulta. Inclusive, en la resolución final, la Junta ordenó a la parte proponente que previo al inicio de su construcción realizara la coordinación correspondiente con la A.A.A. para la conexión del proyecto propuesto.

El informe de la Oficial Examinadora, indicó además, que la Calle Tulip es utilizada como acceso por al menos cuatro (4) desarrollos, por lo que el proyecto agravaría el alegado problema de congestión vehicular ya existente. En su resolución final, la Junta tomó en consideración esta recomendación, pero sostuvo que la Autoridad de Carreteras y Transportación de Puerto Rico no tenía objeción al proyecto propuesto y que la Calle Tulip tenía el acceso controlado. La Junta tomó estos hechos en consideración al aprobar la consulta.

El informe de la Oficial Examinadora señaló además, que el área confronta un problema de inundación al final de la Calle Tulip. Sin embargo, después de tomar en consideración el señalamiento de la Oficial Examinadora, la Junta sostuvo que el predio del proyecto propuesto estaba ubicado fuera del área inundable.

El informe de la Oficial Examinadora indicó además, que la construcción del proyecto podría ocasionar el arrastre de sedimentación, erosión, generación de polvo fugitivo, causando mayores problemas de inundación. Después de tomar en consideración este señalamiento de la Oficial Examinadora, la Junta emitió una serie de instrucciones a la proponente que tendría que seguir y permisos que tenía que obtener para atemperar esta situación.

Luego de exponer todas sus conclusiones de hecho y conclusiones de derecho la Junta llegó a su determinación de aprobar la consulta. Es menester señalar, que después de la aprobación del proyecto, la Junta acogió unas mociones de reconsideración de los opositores del proyecto, las cuales atendió y denegó. Por las razones antes descritas entendemos que la Junta no actuó de forma arbitraria o irrazonable.

Por otro lado, el foro intermedio apelativo señala que con posterioridad al informe emitido por la Oficial Examinadora, el 15 de diciembre 2003, la parte promovente sometió un documento de evaluación ambiental a la J.C.A. que estaba acompañado de los documentos correspondientes al primer proyecto, Consulta Número 2001-17-0371-JPU, que fue

CC-2005-346

denegado el 9 de enero de 2002 y notificado el 20 de febrero de 2002. Primero, tenemos que señalar que el lugar de ubicación del proyecto inicial y el actual, es exactamente el mismo lugar. La única diferencia estriba en un re-diseño conceptual, en donde se reduce el número de apartamentos. Segundo, en el expediente del caso de marras, aparecen cartas de varias agencias, con fecha posterior a febrero 2002, en que se deniega la primera consulta, que se refieren al proyecto actual, donde manifiestan no tener objeción alguna al proyecto. Ejemplo de esto son, el Municipio de San Juan[77], D.R.N.A.[78], I.C.P.[79], A.E.E.[80] y la Autoridad de Desperdicios Sólidos[81]. La Junta al tomar su determinación contó con el beneficio de los comentarios y recomendaciones de las agencias gubernamentales pertinentes. Todos esos endosos, comentarios y recomendaciones eran favorables a la aprobación de la consulta.

En conclusión, entendemos que el Tribunal de Apelaciones erró al revocar la resolución de la Junta. La Junta basó su determinación en la totalidad de la evidencia que obra en el expediente. La Junta tomó en consideración las distintas recomendaciones de las agencias consultadas. Las inquietudes señaladas en el informe de la Oficial Examinadora fueron

---

[77] Apéndice del recurso de *Certiorari*, págs. 25-31.

[78] Íd., págs. 22-23.

[79] Íd., pág. 20.

[80] Íd., pág. 21.

[81] Íd., págs. 33-35.

CC-2005-346

consideradas y contempladas por la Junta. Las conclusiones de la Junta están sustentadas por lo documentos y el informe de la Oficial Examinadora. Al sustituir su criterio, por el de la Junta, el foro intermedio apelativo obvió el conocimiento técnico y especializado que dicha agencia tiene sobre el uso de terrenos en Puerto Rico. Por ello, resulta forzoso concluir que la Junta no abusó de su discreción al aprobar la consulta, ya que su dictamen se apoyó en la totalidad del expediente.

Concluimos que los errores señalados fueron cometidos por el Tribunal de Apelaciones.

IV

Por los fundamentos antes expuestos, revocamos la Sentencia emitida por el Tribunal de Apelaciones y devolvemos el caso a la Junta de Planificación para que continúen los procedimientos de conformidad con lo aquí resuelto.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta disiente con Opinión escrita. El Juez Asociado señor Fuster Berlingeri no intervino.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Vecinos Tulip/Monteverde, Inc.; Clara Emilia Frontera de Guerra; Nilsa Iris López Laureano; Efrén de Jesús García; Asociación de Residentes Urb. La Capiña; Comisión de Ciudadanos al Rescate de Caimito, Inc.; Asociación de Residentes Urb. Borinquen Gardens<br>Recurridos<br><br>v.<br><br>Junta de Planificación de Puerto Rico; José A. López Pérez, Rubén Mercado Brignoni<br>Peticionarios | *Certiorari*<br><br><br>CC-2005-346 | |

Opinión disidente emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 19 de julio de 2007.

La sentencia emitida por este Tribunal concluye que la Junta de Planificación de Puerto Rico no actuó arbitrariamente al aprobar la consulta de ubicación de un proyecto residencial multifamiliar ubicado en la Calle Tulip del Barrio Caimito en el Municipio de San Juan. Sin embargo, la decisión de la Junta de Planificación no está sustentada por el expediente administrativo del proyecto propuesto. Por el contrario, el expediente demuestra que la Junta de Planificación actuó arbitraria e irrazonablemente al aprobar dicha consulta. Por eso, disiento.

I

Reiteradamente hemos establecido que al revisar las decisiones administrativas este Tribunal debe determinar si la agencia actuó arbitraria, irrazonable o ilegalmente. El Tribunal debe evaluar si las determinaciones de hechos de la agencia se sustentan en evidencia sustancial que surja del expediente administrativo y si las conclusiones de derecho son razonables y conforme al derecho aplicable según la totalidad de dicho expediente. Sección 4.5 de la Ley de Procedimiento Adjudicativo Uniforme, 3 L.P.R.A. 2175. Véase además, Misión Industrial v. J.C.A., 145 D.P.R. 908, 929 (1998), Mun. de San Juan v. J.C.A., 152 D.P.R. 673, 707-708 (2000), Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 121-124 (2000), Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 435-438 (1997).

Respecto a las recomendaciones de un oficial examinador, hemos reconocido que aunque la agencia no está obligada a acogerlas, tiene la obligación de considerarlas, analizarlas y discutirlas razonablemente, pues en estricto derecho, dichas recomendaciones forman parte del expediente administrativo. Misión Industrial v. J.C.A., supra, en las págs. 933-934. Además, cuando la decisión de la agencia es contraria a la recomendación de un oficial examinador, particularmente en cuestiones que dependen del contacto inmediato con la prueba, nuestra función revisora debe ser más rigurosa. Henríquez v.

Consejo de Educación Superior, 120 D.P.R. 194, 208 (1984), Oficina del Comisionado de Seguros v. A.E.E.L.A., 2007 T.S.P.R. 112, J.R.T. v. Escuela Coop. E.M. de Hostos, 107 D.P.R. 151, 157 (1978).

II

La Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62 et seq., le otorga la facultad a la Junta de Planificación de adoptar Planes de Usos de Terrenos que designen la distribución, localización, extensión e intensidad de los usos de terrenos del país. Esta ley exige que exista estrecha relación entre la designación de los usos del terreno y la disponibilidad de toda la infraestructura física y social. Además, establece que una vez la Junta de Planificación adopte un Plan de Usos de Terrenos todo proyecto propuesto deberá estar de acuerdo con las recomendaciones de dicho plan. 23 L.P.R.A. 62m.[82]

---

[82] La Ley Orgánica de la Junta de Planificación dispone en lo pertinente:

> **La Junta de Planificación preparará y adoptará Planes de Usos de Terrenos y podrá adoptar aquellos que preparen los organismos gubernamentales y/o entidades que ésta designe.** La Junta de Planificación asesorará, coordinará y asistirá a estos organismos y entidades en la preparación de la metodología a utilizarse en la formulación de estos Planes de Usos de Terrenos de manera que en términos físicos y ambientales estén de conformidad con las políticas y estrategias de desarrollo de Puerto Rico adoptadas por la Junta en el Plan de Desarrollo Integral. **Los Planes de Usos de Terrenos,** dependiendo de si son planes de desarrollo regional, urbano, rural, municipal,

De la misma forma, la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4001 et. seq., en armonía con la Ley Orgánica de la Junta de Planificación, 23 L.P.R.A. sec. 62j(14),[83] le concede la facultad a la Junta de Planificación de aprobar Planes de Ordenación Municipal propuestos por los municipios con el propósito de establecer el uso del suelo dentro de sus límites territoriales. Estos planes deberán cumplir con las políticas públicas, leyes, reglamentos u otros documentos

o dependiendo de su alcance geográfico, **designarán la distribución, localización, extensión, e intensidad de los usos de los terrenos** para propósitos urbanos, rurales, agrícolas, de explotación minera, bosques, conservación y protección de los recursos naturales, recreación, transportación y comunicaciones, generación de energía, y para actividades residenciales, comerciales, industriales, educativas, públicas e institucionales. **Deberá existir una estrecha relación entre la designación de estos usos de terrenos y la disponibilidad y programación de toda la infraestructura física y social**, incluyendo los sistemas de transportación y comunicación. Los Planes de Usos de Terrenos, así como la disponibilidad y programación de la infraestructura física social, serán la base para la preparación y revisión de los mapas de zonificación. **Toda obra o proyecto a ser realizado por cualquier persona o entidad deberá estar de acuerdo con las recomendaciones de los Planes de Usos de Terrenos**, una vez adoptadas por la Junta de Planificación y aprobados por el Gobernador. (Énfasis suplido) 23 L.P.R.A. 62m.

[83] La Junta tendrá las siguientes facultades y funciones:

Hacer determinaciones sobre usos de terrenos dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico, con sujeción a las normas y requisitos consignados en este Capítulo, o en cualquier otra ley aplicable, para tales casos. 23 L.P.R.A. sec. 62j(14).

del gobierno central relacionados con la ordenación territorial de los municipios, entre estos los Planes de Usos de Terrenos. 21 L.P.R.A. sec. 4602. Véase además, sección 5.01 del Reglamento sobre los Planes de Ordenación Municipal y la Transferencia y Administración de Facultades, Reglamento de Planificación Número 24, Reglamento núm. 5087 de 20 de mayo de 1994 (en adelante, Reglamento de Planificación núm. 24).

Hay tres tipos de Planes de Ordenación Municipal: Plan Territorial, Plan de Ensanche y Plan de Área. En lo pertinente a este caso, un Plan Territorial es un instrumento de ordenación integral y estratégico del territorio municipal que define los elementos fundamentales de tal ordenación. A su vez, un Plan Territorial consiste de tres componentes: memorial, programa y reglamentación. Un Reglamento de Ordenación Territorial contiene disposiciones sobre la clasificación del suelo municipal y normas sobre el uso, los niveles de intensidad y las características de las estructuras y el espacio público. Una vez la Junta de Planificación aprueba un Plan Territorial con su reglamento, **toda decisión sobre el uso del terreno municipal se hará conforme al mismo.** 21 L.P.R.A. sec. 4603. Véase además, secciones 7.01, 2.00(37) del Reglamento de Planificación núm. 24.

Una consulta de ubicación es un procedimiento que permite a la Junta de Planificación autorizar por vía de

excepción, ciertos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas zonificadas. Además, mediante este procedimiento se evalúan usos de terrenos propuestos como proyectos de desarrollos extensos o regionales, y usos de terrenos propuestos que pueden afectar significativamente el desarrollo de áreas no zonificadas. El propósito de este procedimiento es evaluar los usos que se proponen y determinar si éstos son cónsonos con la distribución de usos de terrenos planificada en el país. Por eso, la Junta de Planificación requiere expresamente cierta información que le permita llevar a cabo la evaluación. Es en ese momento procesal que la Junta de Planificación debe evaluar la información requerida, si es que ha de cerciorarse, como lo requiere su ley orgánica, que el uso propuesto no está en violación de la reglamentación que establece los usos de terrenos planificados en el país. Sólo así podrá cumplir con la función que le corresponde en la etapa de consulta de ubicación. Esto sin limitar los otros elementos de juicio que la Junta de Planificación puede considerar al evaluar estas consultas, tales como: los Mapas de Zonas Susceptibles a Inundaciones y otra reglamentación ambiental aplicable. Secciones 2.00(7), 7.01 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento de

Planificación núm. 6031 del 12 de noviembre de 1999.[84]

_____

[84] El Reglamento de Procedimientos Adjudicativos de la Junta de Planificación dispone en los pertinente:

**La Junta de Planificación, estudiará, tramitará y resolverá las consultas de ubicación, tomando en consideración, entre otros, los siguientes documentos y elementos de juicio:** Ley Orgánica de la Junta de Planificación (Ley Núm. 75 del 24 de junio de 1975, según enmendada), Ley de Municipios Autónomos (Ley 81 del 30 de agosto de 1991, según enmendada); Plan de Desarrollo Integral, Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico; Planes de Usos de Terrenos (incluye Mapas de Expansión Urbana); Mapas de Zonificación; Mapas de Zonas Susceptibles a Inundaciones; Planes de Ordenación Territorial, adoptados por la Junta de Planificación y aprobados por el Gobernador; Planes Regionales, adoptados por la Junta y aprobados por el Gobernador; Reglamentos de Planificación y otra reglamentación aplicable; Programa de Inversiones de Cuatro Años, localización específica del proyecto, usos existentes en el sector, situación de la infraestructura física y social en el lugar (calles, acueductos y alcantarillado, energía eléctrica, transportación, recogido de basura, servicio policíaco y otros); rasgos topográficos, condición de inundabilidad, condición del subsuelo, densidad poblacional, grado de contaminación del ambiente, distancia entre los terrenos y las áreas construidas, importancia agrícola, ambiental o turística de los terrenos, y otras condiciones sociales, económicas y físicas análogas.
Además de lo anterior, en las consultas públicas, se tomará en consideración, entre otros: el costo del proyecto, la disponibilidad y procedencia de fondos, programación de la obra, posibles conflictos con obras de otros organismos gubernamentales. Si se tratare de una transacción, también se considerará la necesidad de la misma, si la propiedad fue ofrecida a otros organismos gubernamentales, conveniencia de que la propiedad pase de pública a privada, y otras leyes aplicables al tipo de transacción.
La aprobación de una consulta pública no implica, en forma alguna, la aprobación del proyecto de transacción o de construcción en

III

En este caso, los reglamentos aplicables que establecen los usos de terrenos planificados en la ubicación del proyecto propuesto son el Plan de Usos de Terrenos de Puerto Rico y el Plan de Ordenación Territorial del Municipio de San Juan.[85] La Junta de Planificación determinó que el proyecto propuesto cumplía con las metas, objetivos y estrategias del Plan de Usos de Terrenos de Puerto Rico. Sin embargo, de forma arbitraria y contraria a las exigencias legales, no consideró el cumplimiento con el Plan de Ordenación Territorial del Municipio de San Juan como factor pertinente a su decisión sino que se limitó a imponer el cumplimiento con dicho plan, específicamente, con el Reglamento de Ordenación Territorial del Municipio, como una condición futura, **cuando del expediente**

---

sí, el cual deberá regirse por lo establecido en este Reglamento y por cualquier Resolución de la Junta, eximiendo de la presentación a tal proyecto de transacción o de construcción. (Énfasis suplido) Sección 7.01 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento de Planificación núm. 6031 del 12 de noviembre de 1999.

[85] El Plan de Ordenación Territorial del Municipio de San Juan fue aprobado por la Junta de Planificación mediante Resolución el 9 de octubre de 2002, Núm. JP-PT-18-1, aprobado por la Asamblea Municipal de San Juan mediante la Ordenanza Municipal Núm. 73, serie 2001-2002, de 26 de febrero de 2002, y aprobado mediante Orden Ejecutiva el 13 de marzo de 2003, OE-2003-16.

**administrativo surge que el proyecto propuesto está en clara violación del reglamento.**[86]

El proyecto propuesto fue sometido y evaluado como un desarrollo residencial extenso. El Reglamento de Ordenación Territorial del Municipio establece los requisitos que la Junta de Planificación debe considerar al momento de evaluar este tipo de desarrollo y especifica que sólo se podrá dispensar de los mismos a aquellos proyectos que sean para vivienda pública o cuyas circunstancias así lo justifiquen. La sección 4.04(c)(2) del Reglamento de Ordenación Territorial del Municipio dispone los siguientes requisitos para los desarrollos residenciales extensos:

> (a) Los terrenos en los cuales se propone la urbanización estarán localizados o colindando con el área desarrollada dentro del ámbito de expansión urbana.
>
> (b) La densidad propuesta alcanzará los mínimos y no excederá los máximos establecidos en el Plan de Usos de Terrenos vigente ni el Plan de Ordenación Territorial.
>
> (c) Se celebrará vista pública con notificación a los dueños de los terrenos circundantes cuando el desarrollo residencial extenso tenga acceso a una calle municipal con rodaje menor de 8.00 metros por la cual acceden más de diez (10) estructuras residenciales en una distancia de 250 metros, medidos desde las entradas al proyecto.
>
> **(d) Si la infraestructura necesaria para atender las necesidades del proyecto**

---

[86] En su resolución aprobando la consulta de ubicación la Junta de Planificación impuso como condición al proyecto propuesto lo siguiente:

> 6. Deberá cumplir con el Reglamento de Ordenamiento Territorial del Municipio Autónomo de San Juan.

> **propuesto y para mitigar sus efectos directos e indirectos está disponible o puede proveerse.**
>
> (e) El proyecto podrá incluir el desarrollo de una o más estructuras principales en un mismo solar si se propone segregar el mismo.
>
> (f) Se podrá dispensar de los requerimientos de este Reglamento cuando se trate de desarrollos para vivienda pública y las circunstancias así lo justifiquen. (Énfasis suplido).

Respecto al requisito de tener la infraestructura necesaria para atender las necesidades del proyecto propuesto, la Junta de Planificación discutió el mismo en sus conclusiones de derecho haciendo referencia a la infraestructura de energía eléctrica y carreteras e ignorando por completo la necesidad de infraestructura de agua. La Junta de Planificación expresó lo siguiente:

> De la Determinación de Hechos Número 10 surge que el proyecto cuenta con la infraestructura física necesaria para obtener acceso a la carretera y obtener el servicio de energía eléctrica o puede proveerse con relativa facilidad, mediante mejoras requerida por la agencia.

Según el expediente administrativo y el informe de la oficial examinadora, el proyecto propuesto **no cuenta con la infraestructura de agua potable y descarga de aguas usadas necesaria, ya que la Autoridad de Acueductos y Alcantarillados (AAA) no ha endosado el proyecto.**[87] La

---

[87] En lo pertinente, la oficial examinadora señaló:

> Por otro lado, tenemos que considerar que el proyecto no cuenta con la infraestructura necesaria, toda vez que en carta de 14 de febrero de 2003, la Autoridad de Acueductos y

Junta de Planificación no exigió que se cumpliera con este requisito antes de aprobarse la consulta de ubicación, sino que arbitrariamente impuso, como condición futura al proyecto, que los proponentes coordinasen con la AAA la conexión a su infraestructura.[88] Esta determinación de la Junta de Planificación no sólo es contraria a la reglamentación aplicable, sino también preocupante ya que según lo exige la Ley Orgánica de la Junta de Planificación, supra, debe haber una estrecha relación entre la designación de los usos del terreno del país y la disponibilidad de toda la infraestructura física necesaria. 23 L.P.R.A. sec. 62m.

Según las determinaciones de hechos de la Junta de Planificación, la "Quebrada Cheo" discurre al sur del terreno del proyecto propuesto y dispone de las escorrentías pluviales de varias urbanizaciones

---

Alcantarillados indicó que no endosaba el proyecto propuesto.

[88] En la resolución aprobando la consulta de ubicación la Junta de Planificación impuso como condición al proyecto propuesto lo siguiente:

Previo al inicio de la construcción deberá realizar la coordinación correspondiente con la Autoridad de Acueductos y Alcantarillados para la conexión del proyecto propuesto (incluyendo la disposición de las aguas de la piscina propuesta), de manera que la planta de tratamiento de aguas usadas a la cual planean conectarse, las líneas y troncales estén en condiciones de aceptar la descarga de las aguas usadas generadas durante la fase operacional del proyecto. Esto incluye obtener todos los permisos necesarios de dicha agencia, previo a su conexión.

adyacentes, incluyendo parte de las originadas en la Calle Tulip. Por esto, la sección 5.03(g) del Reglamento de Ordenación Territorial del Municipio exige que se dedique a uso público una franja de terreno con un ancho mínimo de diez (10) metros lineales a ambos lados del cauce o lecho de dicha quebrada. Aunque la Junta de Planificación reconoce esta exigencia reglamentaria, el expediente administrativo revela que **el proyecto propuesto no cumple con dicha exigencia**. En primer lugar, en la Evaluación Ambiental del proyecto propuesto los proponentes afirman que sólo dejarán una franja de cinco (5) metros desde el borde de la quebrada. En segundo lugar, en el Acta de Inspección Ocular que llevó a cabo la propia agencia se dispuso lo siguiente:

> Se observó el predio del proyecto en cuestión desde la parte de la quebrada. Auscultando con el **plano del proyecto aprobado,** en algunas áreas se desglosa una faja de 10 metros con la colindancia con la quebrada, **en otras se describe una faja menor de (5 metros). De dejarse los diez metros en toda la colindancia con la quebrada, interferiría con la estructura que albergaría 40 apartamentos.** El proponente describió que en algunas áreas no se estipula hacer muro de contención.[89] (Énfasis suplido).

---

[89] Inclusive, el propio plano de ubicación sometido ante la Junta de Planificación e incluido como apéndice en el recurso de certiorari presentado ante este Tribunal demuestra que el proyecto propuesto no deja una franja de diez (10) metros en toda su colindancia con la "Quebrada Cheo". Lo que es peor, en su recurso de certiorari los peticionarios erróneamente afirman que cumplen con este requisito reglamentario y hacen referencia al plano de ubicación aprobado por la Junta de Planificación que contradice dicha afirmación.

Contando con esta evidencia en el expediente administrativo, la Junta de Planificación decidió aprobar la consulta de ubicación del proyecto propuesto, en clara violación al Reglamento de Ordenación Territorial del Municipio de San Juan.

Finalmente, la oficial examinadora señaló que en eventos de lluvia abundante el nivel de la "Quebrada Cheo" causa inundaciones al final de la Calle Tulip, donde ubica el proyecto propuesto. La resolución de la Junta de Planificación no contradice esta significativa determinación fáctica, sino que la despacha indicando que el predio del proyecto propuesto se encuentra fuera del área inundable. Esto, sin embargo, no es pertinente al asunto de las inundaciones al final de la Calle Tulip. El "razonamiento" de la Junta es más bien un *non sequitur* puesto que el hecho de que el proyecto propuesto no esté ubicado en zona inundable no implica razonablemente que su impacto en la "Quebrada Cheo" no habrá de incrementar las inundaciones al final de la Calle Tulip. Más aún cuando del expediente administrativo surge que no se ha dejado la franja de terreno de diez (10) metros exigida por la reglamentación aplicable.

IV

Por todo lo anterior es evidente que la determinación de la Junta de Planificación no está sustentada por el expediente administrativo ni es conforme al derecho aplicable según la totalidad de dicho

expediente. 3 L.P.R.A. 2175. Véase además, <u>Misión Industrial v. J.C.A.</u>, supra, <u>Mun. de San Juan v. J.C.A.</u>, supra, <u>Rivera Concepción v. A.R.P.E.</u>, supra, <u>Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.</u>, supra. La Junta de Planificación actuó arbitrariamente al aprobar la consulta de ubicación del proyecto propuesto y no cumplió con su función legal en la etapa de consulta de ubicación, ya que al evaluar la información requerida en dicho momento procesal no se aseguró de que el uso propuesto no estuviera en violación de lo requerido por el Plan de Ordenación Territorial del Municipio de San Juan.

La Junta de Planificación y la sentencia mayoritaria de este Tribunal tratan de justificar la determinación arbitraria de dicha agencia afirmando que en la próxima etapa del proyecto propuesto la Administración de Reglamentos y Permisos (A.R.P.E.) deberá asegurarse de que se cumplan las condiciones impuestas por la Junta de Planificación. Este argumento no tiene mérito, pues aunque A.R.P.E. debe exigir el cumplimiento con las condiciones impuestas por la Junta de Planificación, las leyes y la reglamentación aplicable, la Junta no puede abdicar su propia obligación de asegurarse que el proyecto propuesto cumple con la reglamentación que establece los usos de terrenos del país, según la información requerida en la etapa de evaluación de la consulta de ubicación. En el caso ante nuestra

consideración sucede todo lo contrario. No es que el proyecto propuesto no incluya información detallada y no requerida en la etapa de consulta de ubicación que demuestre su cumplimiento con el Plan de Ordenación Territorial del Municipio de San Juan, sino que **la información requerida en esta etapa revela que el proyecto propuesto está en violación de dicho plan**. Si permitimos que la Junta de Planificación actúe de esta manera, entonces la etapa de consulta de ubicación resultaría innecesaria y superflua, ya que A.R.P.E. podría adjudicar la consulta de ubicación en la próxima etapa de evaluación del proyecto.

Por todas estas razones disiento de la sentencia mayoritaria que revoca la sabia decisión del Tribunal de Apelaciones.

Liana Fiol Matta
Jueza Asociada